786 A.2d 34

**Eduardo Elias Rosas GRANT,**

v.

**STATE of Maryland.**

**No. 2994, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

Dec. 4, 2001.

Allen E. Burns, Assistant Public Defender (Stephen E. Harris, Public Defender, on the brief,) Baltimore, for appellant.

Rachel Marblestone Kamins, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore, and Davis R. Ruark, State's Attorney for Wicomico County, Salisbury, on the brief,) for appellee.

Argued before HOLLANDER, KRAUSER, and JAMES S. GETTY, (Retired, specially assigned) JJ.

KRAUSER, J.

Responding to a 911 call, police officers entered the apartment of appellant, Eduardo Elias Rosas Grant. That intrusion led to a scuffle with appellant, and ultimately the discovery of cocaine and drug-related paraphernalia in his room. He was then arrested and charged with a variety of drug offenses, as well as assault and resisting arrest. A trial on

those charges was scheduled in the Circuit Court for Wicomico County.

Before trial, appellant moved to suppress the drugs and drug-related paraphernalia, which included, among other things: a digital scale, a bowl, a sifter, a cutting agent, and a pestle. That motion was denied, and, after a bench trial, appellant was convicted of possession of cocaine, possession with intent to distribute, possession of a device adopted for the production of controlled dangerous substances, possession of paraphernalia, resisting arrest and two counts of assault.

The circuit court thereafter merged appellant's conviction for possession of cocaine into his conviction for possession with intent to distribute, and his conviction for possession of drug paraphernalia into his conviction for possession of a device adopted for the production of controlled dangerous substances. But the court denied appellant's request that it merge his assault convictions into his conviction for resisting arrest.

Following sentencing, appellant noted this appeal, claiming that the police had unlawfully searched his room, that the scale found in his bedroom did not constitute a device adopted for the production of controlled dangerous substances, and that his assault convictions should have been merged by the circuit court into his resisting arrest conviction. Although we reject appellant's contention that the search of his bedroom was unlawful, we agree that the scale did not constitute a device adopted for the production of controlled dangerous substances and that one of the assault convictions should have been merged with his conviction for resisting arrest.

## BACKGROUND

### A. Motion to Suppress Hearing

Prior to trial, appellant filed a motion to suppress "all the evidence seized, both before ... and after the search warrant was obtained." A pre-trial hearing was held on that motion and testimony presented by both sides. The following is a summary of the evidence presented at that hearing.

On the evening of June 3, 2000, at approximately 7:30 p.m., the Salisbury City Police Department received an "open" 911 call; an "open" call is one in which no one speaks. In this instance, however, there were sounds of fighting in the background. In response to that call, police officers Howard Drewer, Chris Taylor and Lisa Purnell went to the address they were given by dispatch. That address was the apartment of appellant.

Upon arriving at appellant's apartment, the three officers approached the front door. That door was "completely open," but the outer storm door was closed. The storm door was aluminum with a screen panel. Looking through the screen, Officer Taylor observed a woman, later identified as Betty Huntley, and a small child, Ms. Huntley's grandchild. The small child, according to the officer, was "having fun walking around the living room . . . . ."

Officer Taylor knocked on the storm door, and Ms. Huntley looked at him. Through the screen, Officer Taylor informed Ms. Huntley that the police department received an "open 911 line," and asked her if "everything [was] okay." Ms. Huntley responded that everything was fine, but did not approach the officers. Instead, according to Officer Taylor, she just "kept doing what she was doing." Her peculiar behavior prompted the officer to ask if he and his fellow officers could enter the apartment. When Ms. Huntley indicated that they could, the three officers entered the apartment but remained in the foyer.

Within a few seconds, Ms. Huntley's daughter, Tomeka Jackson, "walk[ed] around the corner" wearing a white shirt with "four or five blood spots." The officers asked Ms. Jackson if "everything [was] ok." In reply, Ms. Jackson stated, "there's no problems," and explained that her "child [had] dialed 911." Referring to her blood stained shirt, Officer Purnell asked Ms. Jackson "who's hurt?" She picked up her daughter and stated, "[O]h, she was running around and fell and busted her lip." She then brushed the small child's lip with her hand, as if to wipe off blood. But Officer Taylor

noticed that "there was no blood coming off on [Ms. Jackson's] fingers" and that "the child's lips were not swelled." The officer further observed that the child's lips "didn't look bruised at all, the child wasn't crying, no puffy eyes, eye's weren't red, it didn't look like the child was upset at all." He further noted that Ms. Jackson's explanation was inconsistent with the fact that the child "was having fun walking around the living room when [the officers] first approached."

The officers asked Ms. Jackson if there was anyone else in the house other than herself, her mother, and her child. She replied "no." Just as she said "no," the officers "heard a door shut behind [Ms. Jackson] coming from [the] hallway." Concerned that there might be an injured individual in the apartment, Officer Drewer walked over to the door and knocked. From behind that door, appellant asked who it was, and Officer Drewer identified himself as a police officer. He then requested that appellant open the door. Instead of complying with the officer's request, appellant asked what he wanted. The officer repeated his request.

While this was going on, Ms. Jackson, who was with Officers Taylor and Purnell in the living room, became upset. Officer Taylor asked her, "[W]ho's hurt, who's in there?" Ms. Jackson replied, according to Officer Taylor, "[W]hat ever it is, I did it," and sat on a sofa in the living room with "her head down."

Finally, as Officer Drewer had requested, appellant opened the door. He emerged from the room with two scratches on his neck that were "fresh and slightly bleeding." In addition to the scratches, appellant was holding a bandana to his right arm. Officer Taylor asked appellant to remove the bandana. When he did, the officer observed a three-quarter inch cut within the crook of appellant's elbow. This cut, according to the officer, "appeared to be deep" and "freshly bleeding." Appellant's "eyes were really red and glassy." "At that point, not knowing ... if there was another person in [the room] injured or worse or caused the injury to [appellant], Officer Drewer went into the room to look for anybody else." Refer-

ring to the cut on appellant's arm, Officer Taylor then "asked [Ms. Jackson] where the knife was;" she replied that appellant "had taken it . . . into the room."

The room Officer Drewer entered was "maybe fifteen feet long by maybe ten feet wide," and rectangular in shape. The door to the room, which was at the base of the rectangle, opened to the left. Looking into the room from the door, the right side of the room was not visible. From that vantage point, Officer Taylor testified, "[t]here could be . . . easily five or six people that we could not see."

Inside the room, a sofa was resting against the left wall. Just beyond the sofa was a desk. Officer Drewer walked past the sofa, looked down between the sofa and desk and, "in plain view on a stack of . . . magazines or books, was a ceramic bowl, a pestle inside the ceramic bowl, a sifter beside both of those, and white powder kind of dusted on top of them."

Once Officer Drewer observed these items, appellant "became hostile and started fighting" with Officer Taylor. This led Officer Drewer to immediately leave the room to assist Officer Taylor. After handcuffing and placing appellant under arrest, Officers Taylor and Drewer returned to the room and looked for the knife used to cut appellant. In their search for a knife, Officer Drewer opened the top drawer of the desk and found "several small baggies of what appeared to be at that point cocaine. . . ." The officers then ended their search and sought a search warrant to search to remainder of appellant's home. After executing that warrant, police found and seized two bags containing cocaine, twenty-three "corner bags" of cocaine, a bowl and pestle containing traces of cocaine, a kitchen sifter containing traces of cocaine, Inositol powder, a digital scale containing cocaine residue, and ziplock bags.

The motions court denied appellant's motion to suppress. In doing so, the court found that exigent circumstances existed justifying the pre-warrant search of appellant's bedroom and the items discovered there—the bowl, pestle, and sifter which were coated with a powder later found to be cocaine, were in plain view of the officer. As for the cocaine found in

appellant's desk drawer, however, the court held that it was "not persuaded that it was necessary to continue to search [the desk drawer] without a warrant." "Nevertheless," continued the judge, "it may be properly admitted as falling under the inevitable discovery exception to the exclusionary rule." The court thus denied appellant's motion to suppress as to all items seized by the police from appellant's room.

## B. The Trial

At appellant's bench trial, the State presented three witnesses: Officer Howard Drewer, a forensic chemist, and Officer Matt Brown, an expert in drug trafficking. Officer Drewer testified much as he did at the suppression hearing. But, at trial, he gave a more detailed account of the officers' struggle with appellant that led to the assault and resisting arrest charges.

He stated that, after observing the bowl, pestle, and sifter on top of a pile of magazines, he turned and saw Officer Taylor struggling with appellant. He ran over to assist Officer Taylor; at which point, Officer Purnell joined in the effort to restrain appellant. Officer Drewer informed appellant that he was under arrest and instructed him to place his hands behind his back; ignoring that request, appellant continued to struggle. During that struggle, Officer Drewer was struck several times by appellant's arms and legs. He was also kicked by appellant while he and the other officers were attempting to handcuff him. "The entire time," Officer Drewer testified, "it was a wrestling match and a fight."

The State's second witness, Isabel Conley–Waters, the forensic chemist manager for the Maryland State Police Crime Lab, testified as an expert in the field of chemistry and the analysis of narcotics. She stated that the bowl, pestle, and sifter seized from appellant's room contained traces of cocaine.

The State's third witness, Officer Matt Brown, testified as "an expert in the fields of evaluation, identification of cocaine, CDS investigations, and common practices of users and dealers." He testified that the Inositol powder, seized from

appellant's room, "is a common form of cut or powder used to break down powder cocaine for resale." "Inositol," he explained, "is . . . a body friendly chemical as opposed to other things that are used for cut such as rat poison . . . so, it's a common, if not somewhat expensive way of increasing your amount of cocaine." "By breaking down the amount of cocaine that [drug dealers] have," he stated, "they're reducing the purity rate and they're also increasing the amount of profit that they can make on any given amount of cocaine."

As for the bowl and pestle seized from appellant's home, Officer Brown stated that they are used "in preparing powder cocaine for distribution." Officer Brown described the use of the bowl and pestle as follows:

[THE STATE]: And how is [the bowl and pestle] used in that arena?

[OFFICER BROWN]: In different fashions. Sometimes when cocaine comes to the dealer obviously it's at a fairly higher purity rate. Most dealers, as a matter of fact all dealers that I have been acquainted with break that down for resale. Often that comes in chunks which are cut directly off the kilo. Also the mixing, what's commonly referred to as cut or in this case it's Inositol, often comes in tablet form. Those items have to be broken down and mixed and this is a common way of doing that.

[THE STATE]: What is actually placed into the bowl then?

[OFFICER BROWN]: Both cocaine and whatever the cut is.

[THE STATE]: Then what is done with the pestle?

[OFFICER BROWN]: The pestle is used to mash or break and mix the items as they are mashed in the bowl.

As for the sifter that was found in appellant's room, Officer Brown described the role it played "in the process" as follows:

[THE STATE]: How is that flour sifter significant to the case, in your opinion?

[OFFICER BROWN]: Once again this is another item that is used in the process and preparation of powder cocaine for resale.

[THE STATE]: How is it used?

[OFFICER BROWN]: What was mashed together in this bowl would be poured into [the sifter] and basically it's another way of refining the powder or bringing it to a finer powder as opposed to having clumps of hard unmixed substance in the middle of your powder cocaine.

Officer Brown then opined that the digital scale seized from appellant's room was "used in packaging and producing powder cocaine for resale on the street." His opinion was based on "the white powder residue" he observed "all over the scale" and on a series of electronically recorded weights stored in the scale's memory. He explained that the scale's "tara function," "a function that records the last hundred or so weights that were recorded to the scale," recorded a series of weights "consistent with the weights of quantities of cocaine when they are packaged for resale."

At the end of the trial, the court convicted appellant of possession of cocaine, possession with intent to distribute, possession of a device adopted for the production of controlled dangerous substances, possession of paraphernalia, two counts of assault, and resisting arrest. The court merged appellant's conviction for possession of cocaine into possession with intent to distribute, and the possession of paraphernalia into the possession of a device adopted for the production of controlled dangerous substances. But it denied appellant's request that it merge the assault convictions into the resisting arrest. This appeal followed.

## DISCUSSION

### I.

Appellant contends that the motions court erred in denying his motion to suppress the items seized from his room. He maintains that "the police intrusion well beyond the front

entrance way of the residence and then all the way to the far end of appellant's previously closed room ... was unreasonable under the Fourth Amendment, and the evidence seen during the extended intrusion, as well as the fruits of that initial search, should have been suppressed." In other words, appellant does not challenge the right of the police officers to enter the apartment after obtaining the consent of Ms. Huntley to do so, but the search of appellant's room that followed. In fact, referring to "the initial observations of the responding officers" while standing in the foyer of the apartment, appellant states in his brief that "[t]he police were reasonable in acting as they did during the first stage." But he does maintain that what they "heard and saw" at that stage did not "support a reasonable belief that a warrantless foray into and through [his] room was necessary."

In considering the denial of a motion to suppress, we look only to the record of the suppression hearing. *See Trusty v. State*, 308 Md. 658, 670, 521 A.2d 749 (1987) (citing *Jackson v. State*, 52 Md.App. 327, 332 n. 5, 449 A.2d 438, cert. denied, 294 Md. 652 (1982)). In reviewing that record, we defer to the fact-finding of the suppression court and accept findings of facts made by that court, unless they are clearly erroneous. *Ferris v. State*, 355 Md. 356, 358, 735 A.2d 491 (1999); *McCray v. State*, 122 Md.App. 598, 615, 716 A.2d 302 (1998); *Graham v. State*, 119 Md.App. 444, 449, 705 A.2d 82 (1998). We, however, make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case. *Jones v. State*, 343 Md. 448, 457, 682 A.2d 248 (1996). Having done so in the case *sub judice*, we are satisfied that the motions court did not err in denying appellant's motion to suppress. In other words, the warrantless search of appellant's room by police did not violate the Fourth Amendment.

The Fourth Amendment permits only reasonable searches and seizures. *See Carroll v. State*, 335 Md. 723, 729, 646 A.2d 376 (1994) (citing *Florida v. Jimeno*, 500 U.S. 248, 249–50, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)). Searches

without a warrant are *"per se* unreasonable" except in a few well-defined and carefully circumscribed instances. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). This is particularly true when the search of a residence is involved. In that instance "a greater burden is placed . . . on officials who enter a home or dwelling." *See Payton v. New York,* 445 U.S. 573, 587, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). A warrantless search of a residence, however, is constitutionally permissible when exigent circumstances arise, *see, e.g., Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978) (acknowledging the right of police to conduct a warrantless search in "emergency situations"), or, in other words, when officials are faced with a "compelling need for official action and no time to secure a warrant.' " *See Wengert v. State,* 364 Md. 76, 85, 771 A.2d 389 (2001) (quoting *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 1950, 56 L.Ed.2d 486 (1978)). Indeed, "[e]xigent circumstances are 'those in which a substantial risk of harm to the persons involved or to the law enforcement process would arise if the police were to delay a search until a warrant could be obtained.' " *See Wengert,* 364 Md. at 85, 771 A.2d 389 (quoting *United States v. Robertson,* 606 F.2d 853, 859 (9th Cir.1979)).

With this in mind, we begin our analysis with a review of the decision of the motions court. After summarizing the "credible testimony" presented, the court stated, "The first issue before the court is whether it was reasonable for the officers to enter the apartment at 205 Elizabeth Street and thereafter if it was reasonable for them to check the room in which the defendant was located."

Relying principally on *United States v. Richardson,* 208 F.3d 626 (7th Cir.2000), *cert. denied,* 531 U.S. 910, 121 S.Ct. 259, 148 L.Ed.2d 188 (2000), the court stated:

It seems clear to this Court that exigent circumstances existed as a result of, number one, the apparent struggle reported on an open 911 line; and number two, the officers' observations at the residence at 205 Elizabeth Street of at a minimum a woman with what appeared to be blood on her

shirt. Any evidence that the police officers inadvertently discovered in plain view or as a result of some activity on their part that bears a material relevance to the initial purpose of the entry may lawfully be seized without a warrant.

The court therefore concluded that the drug paraphernalia observed lying on the floor of appellant's room was lawfully seized pursuant to the plain view doctrine.

The court continued:

Now then, the second issue is whether the contraband found in the desk drawer may be admitted even though it was not in plain view. And the State argues that the desk drawer was opened as a result of the officers' quest to recover the knife that apparently had been used in the wounding of the Defendant and also for the officers' safety.

Rejecting that argument, the court observed that "before the drawer was opened the Defendant had been restrained and the room had been at least partially secured" and "the Defendant had been arrested." The court therefore concluded that it was "not persuaded that it was necessary to continue to search without a warrant."

The court nonetheless declined to grant the motion to suppress as to "the cocaine that was found in the desk drawer," reasoning:

The cocaine and drug paraphernalia the officers saw once in the room were in plain view and admissible. Therefore, the officers could have and likely would have secured a search warrant for the apartment even if they did not observe the cocaine bags in the desk drawer. The cocaine in the desk drawer, the most logical place in which to conduct a search not only for evidence of drugs but for evidence of a weapon used in the assault on the Defendant, would have been located and acquired in any event.

The court therefore held that the seizure of the bags of cocaine was not violative of the Fourth Amendment under the inevitable discovery exception to the exclusionary rule, a con-

clusion which appellant does not now question. Instead, he challenges the right of police to enter his room on the grounds that there were no exigent circumstances to justify that warrantless intrusion. Specifically, he claims that "there was no reason to believe that anyone was hidden in the room" and if there was, the police "did not have to go far into the room, which was 12 to 15 deep to ascertain that no one else was there." He further maintains that the possible presence in appellant's room of the knife that was used to cut him also did not justify the search in question. "Ms. Jackson," appellant claims, "had effectively admitted injuring appellant," and neither she nor appellant was in a position to enter the room to obtain it.

Nonetheless, the analysis performed by the motions court and the conclusions it reached are sound. In upholding the right of the police, under the exigent circumstances exception to the warrant requirement, to enter appellant's residence and his room up to the point when his desk drawer was opened, the court, as noted earlier, chiefly relied upon *Richardson.* A more detailed review of that case is therefore appropriate.

In *Richardson,* police received a 911 telephone call reporting that the defendant had raped and murdered a woman, and that her body could be found in the basement of the defendant's residence. *Richardson,* 208 F.3d at 627. The caller identified himself to the 911 operator as an individual living with the defendant. *See id.* at 628. A week before this call, the police received a similar telephone call reporting a murder at the same address; that call, however, turned out to be a false alarm as no murder victim was found. *See id.*

In response to the 911 call, police officers went to the defendant's home and conducted a warrantless search of the residence. *See id.* Although their search failed to uncover a body, police officers did find marijuana, crack cocaine, drug-packing materials, two scales, and a shotgun; therefore the officers arrested the defendant. *See id.*

The defendant subsequently filed a motion to suppress this evidence. Denying that motion, the district court concluded

that exigent circumstances justified the warrantless entry made by police, and then found defendant guilty for unlawfully possessing a firearm and possession with intent to distribute cocaine. *See id.* at 627–29. On appeal, the defendant challenged the district court's denial of his motion to suppress, observing that the police had received a false call concerning the defendant a week earlier. *See id.* at 629–30. Because of that false call, the defendant argued, there was no reasonable basis for the officers to believe that someone inside the defendant's house needed assistance. *See id.* The United States Court of Appeals for the Seventh Circuit disagreed.

The Seventh Circuit began its analysis by noting that it had previously "found that exigent circumstances justified a warrantless search when the police reasonably feared for the safety of someone inside the premises." *See id.* at 629. Quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C.Cir. 1963), it observed, " '[t]he business of policemen and firemen is to act, not to speculate or mediate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process.' " *See id.* at 630. But the Seventh Circuit cautioned, "[A] police officer's subjective belief that exigent circumstances exist is insufficient to make a warrantless search." *See id.* at 629. The test, according to that court, "is objective: 'the government must establish that the circumstances as they appeared at the moment of entry would lead a reasonable, experienced law enforcement officer to believe that someone inside the house, apartment, or hotel room required immediate assistance.' " *See id.* (quoting *United States v. Arch*, 7 F.3d 1300, 1304 (7th Cir.1993)). In sum, the Seventh Circuit held that police may search a residence without a warrant if they have a reasonable fear for the safety of someone inside the premises, or reasonably believe a person is in need of immediate aid.

Applying that standard to the instant case, we are persuaded that the search of appellant's room was constitutionally permissible because the investigating officers had a reasonable belief that there might be someone in appellant's room in need

of "immediate assistance" or who might be armed and dangerous. Indeed, the circumstances of the instant case are objectively even more compelling than those faced by the investigating officers in *Richardson.*

In the case before us, the police received an open 911 call from someone at appellant's residence. Although no one spoke, there were background sounds indicating a struggle. When police arrived, they peered through a storm door and saw an elderly woman, later identified as Betty Huntley, the mother of Ms. Jackson, and a small child "having fun walking around the living room...." They informed Ms. Huntley that they had received a 911 call and asked her if everything was okay. She responded that everything was okay but strangely did not approach the officers or otherwise engage them. The officers asked if they could enter the residence and Ms. Huntley replied that they could. Upon entering, they observed Tomeka Jackson, Ms. Huntley's daughter, walk into the living room wearing a white shirt with "four or five blood spots." They asked Ms. Jackson if "everything [was] okay," and she responded "there's no problem," claiming that her child had dialed 911. To explain the blood stained shirt, she stated that her daughter had fallen and "busted her lip," even though there was no evidence of blood on the child's lips nor any indication that the child had been crying. In fact, her daughter appeared to be having fun. She then pretended to wipe away blood from her daughter's lips. The officers asked if there was anyone else in the house. Just as she said "no," the police heard a door shut in the hallway.

Believing that someone inside the premises might be hurt or armed, one of the officers went to the door that had just closed and knocked. From behind the door, appellant asked who it was, and the officer identified himself as a police officer and asked appellant to open the door. Instead of complying with the request, appellant asked the officer what he wanted.

At this time, Ms. Jackson, who was in the living room with the other two officers, was becoming increasingly restive. In response to one of the officers' questions as to who was in the

room and who was hurt, she replied, "whatever it is, I did it," and sat on the sofa with her head down.

Finally, appellant complied with the officer's request to open the door. When he did, the officer observed two scratches on appellants' neck that were "fresh and slightly bleeding." The officer also observed that appellant was holding a bandana to his right arm. When he removed the bandana at the officers request, the officer observed a three-quarter inch cut within the crook of his elbow. The cut, according to the officer, "appeared to be deep" and "freshly bleeding." The officer then entered the room to determine if there was anyone else inside who might be injured or armed. Moreover, at that time, Ms. Jackson indicated to another officer that the knife that had been used to cut appellant was in that room. Upon entering appellant's room, the officer walked towards the back of the room and observed, on the floor, the scale, pestle, bowl, and sifter covered with a white powder that he believed, based on his experience, to be cocaine. Consequently, the motions court had ample evidence to find that exigent circumstances justified the entry of the police into appellant's residence and room.

Indeed, when considered altogether—the troubling 911 call with background sounds of a struggle, Ms. Huntley's peculiar behavior when the police arrived, the fresh blood stains on Ms. Jackson's shirt, her patently false explanation of how the blood stains got there, her attempt to mislead police by claiming no one else was in the apartment, appellant's initial refusal to open his door, the fresh cuts police observed on his neck and arm once he did—there was a "reasonable basis" for Officer Drewer to believe that someone else was in the appellant's room who might be either armed or injured or both. Exigent circumstance therefore justified the warrantless search of appellant's room. See Alexander, 124 Md.App. at 277, 721 A.2d 275. Because the police had a lawful right to search that room, they also had a right to seize drug paraphernalia in plain view. See Wengert, 364 Md. at 87–90, 771 A.2d 389.

Appellant claims, however, that the motions court should have relied upon *United States v. Meixner*, No. 00–CR–20025–BC, 2000 U .S. Dist. LEXIS 15857 (E.D.Mich. Oct.23, 2000), and not *Richardson* . Specifically, appellant argues that *Meixner* is factually similar to the instant case. In *Meixner*, during an argument between the defendant and his girlfriend, she dialed 911 and hung up without speaking. The argument ended, and the two got ready for bed.

The girlfriend's 911 hang-up call provided police with caller identification information. With that information, state police officers drove to the address given to them by dispatch. Upon arriving at that address, the officers knocked on the defendant's door. The defendant answered the knock, and the officers informed him of the 911 call. When the defendant stated that he made no such call, the officer asked if there was another person in the residence. The defendant replied that there was and called out to his girlfriend. The defendant's girlfriend emerged from their bedroom, sat down on the couch, and did not look at the officers. She was scantily dressed and appeared to be crying. Neither the girlfriend nor the defendant showed any signs of injury, but both appeared to have been drinking alcohol. The defendant's girlfriend did not acknowledge making the 911 call and informed the officer that his presence was not needed. Nonetheless, without the defendant's consent, the officer made a warrantless entry and searched his home to determine if there was anyone inside "in need of immediate aid." The officer's search revealed a rifle on a wall in the main bedroom, and a derringer-style pistol on the closet shelf. These weapons were not seized, and no arrests were made.

Later, the officer reported his findings to an agent of the Bureau of Alcohol, Tobacco, and Firearms ("BATF"). Using that information, the agent obtained a search warrant. A search of the defendant's home resulted in the seizure of the firearms previously observed by the state police. The defendant was thereafter charged with being a felon in possession of a firearm and of possessing a sawed-off shotgun. The defendant filed a motion to suppress, claiming that the

BATF's search warrant was tainted by the earlier warrantless entry by state police into his home. The United States District Court for the Eastern District of Michigan agreed.

In determining whether the 911 hang-up call justified the warrantless entry in question, the district court distinguished *Richardson* from the case before it.

> Unlike the situation in *Richardson,* the 911 call in this case announced no emergency. It was a hang-up call which at most gave rise to the *possibility* of an emergency. When the officers arrived at the scene, they encountered denials from the occupants of the residence that an emergency existed. Of course, the officers were not obligated to take the word of the subjects that no mischief was afoot; yet without some positive indication to the contrary—some objective manifestation of the existence of an emergency situation demanding immediate action—the officers were not justified in physically intruding into the sanctity of the home.

*Meixner, supra at* *27.

The only feature shared by *Meixner* and the instant case is that both involved an "open line" 911 call—a call in which the maker does not speak. But that is where similarity between the two cases ends. Unlike the 911 call in *Meixner,* the "open line" 911 call in the instant case gave rise to more than just a mere possibility of an emergency. In the background, sounds of a struggle were heard.

Moreover, contrary to appellant's claim that in both cases the investigating officers were met with a "peaceful scene," the officers' initial encounter with the occupants in appellant's apartment was far from normal. Ms. Huntley's evasive answers were swiftly followed by the appearance of Ms. Jackson in a blood stained shirt. The officers' fears were then heightened when Ms. Jackson concocted a patently false explanation for the blood stains—blaming them on her daughter's fall—and then falsely asserting that there was no one else in the apartment.

The emergence of appellant from his room with scratches on his neck and a cut on his arm led the officers to reasonably believe that there might be someone injured or armed in his room. Thus, in contrast to *Meixner*, the officers had "some objective manifestation of the existence of an emergency situation demanding immediate action."

## II.

One of the items seized from appellant's room was a digital scale. That scale provided the basis for convicting appellant of possession of a device adopted for the production of a controlled dangerous substance under Maryland Code (1957, 1996 Repl.Vol., 2000 Cum.Supp.), Art. 27, § 286(a)(4). Also seized, among other things, were a bowl, a pestle, a sifter, and G & C Inositol powder, a cutting agent. Most of those items had a white powder residue. Challenging that conviction, appellant argues that "the State's expert witness testified only that the scale was 'used in packaging and producing powder cocaine for *resale* on the street,' " and that there was no evidence that the scale was adopted for the production of cocaine. We agree.

Section 286(a)(4) makes it unlawful for any person to possess any device "adopted for the production of controlled dangerous substances...." "Production" is defined by § 277(u) as including "the manufacture ... of a controlled dangerous substance." And "manufacture" is defined by § 277(p) as "the production, preparation, propagation, compounding, conversion or processing of a controlled dangerous substance *either directly or indirectly by extraction from substances of natural origin, or independently by means of chemical synthesis* ...."(Emphasis added.)

The State does not contend that the scale was used for the purpose of extracting cocaine "from substances of natural origin," but it does maintain that the scale in question was adopted for the production of cocaine by chemical synthesis. Interestingly enough, both sides cite *Davis v. State*, 319 Md. 56, 570 A.2d 855 (1990), in support of their respective although conflicting positions on this issue.

In *Davis,* the issue before the Court of Appeals was "whether a glass jar adopted for the purpose of coating parsley with phencyclidine (PCP), or plastic 'baggies' and other containers adopted for packaging or repackaging of PCP, can, under the particular circumstances of [that] case, be considered devices for the production of a controlled dangerous substance within the meaning of [Article 27, § 286(a)(4) ]." *See Davis,* 319 Md. at 58, 570 A.2d 855. In that case, the police found in appellant's automobile, among other things, one glass jar containing PCP treated parsley flake residue, one glass jar containing PCP treated parsley flakes, a film canister with residue, and five plastic baggies containing PCP treated parsley in a glass jar. *See id.*

At trial, the State's expert witness testified that the jars were used "to coat the parsley with PCP." *See id.* at 59, 570 A.2d 855. Once coated with PCP, the parsley was measured and divided into saleable quantities using the film canister, and then placed into the plastic baggies. *See id.* The defendant was found guilty of the possession of a device adopted for the production of PCP with the intent to distribute under § 286(a)(4), as well as possession of PCP and possession of PCP with the intent to distribute it. *See id.*

Reviewing the defendant's conviction under § 286(a)(4), the Court of Appeals held that "[t]he obvious legislative intent was to include packaging and labeling within the definition of 'manufacture' when that packaging or labeling is in conjunction with a *true* manufacturing process." *See id.* at 62, 570 A.2d 855 (emphasis added). The Court concluded that "[t]here [was] no evidence that Davis was manufacturing PCP, and neither the application of PCP to parsley nor the packaging or repackaging of the coated parsley can properly be called manufacturing." *See id.* "If it is not manufacturing," the Court stated, "it cannot fit within the statutory definition of 'production.'" *See id.* The Court concluded that the evidence was not sufficient to support Davis's conviction for possession of a device adopted for the production of PCP. *See id.*

Citing the Court of Appeals' definition of "manufacture" in *Davis*, appellant argues that the evidence was not sufficient to support his conviction under § 286(a)(4). On the other hand, appellee maintains that "the evidence showed that [appellant] was engaged in the manufacture of cocaine, indicated by the presence of the cutting agent, bowl and pestle, and sifter, as well as the expert testimony detailing how those objects are utilized." The expert testimony to which appellee refers was that of Officer Matt Brown, "an expert in the fields of evaluation, identification of cocaine, CDS investigations, and common practices of users and dealers."

■ "[I]n a sufficiency of the evidence challenge, the appellate court is not to ask whether it believes that the evidence at trial established guilt beyond a reasonable doubt. Rather, the court only asks 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Pagotto*, 361 Md. 528, 534, 762 A.2d 97 (2000) (quoting *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781).

Officer Brown testified only to "the process" appellant employed to "break down powder cocaine." This "break down" involves "reducing the purity" of cocaine by adding a substance, in this case Inositol, to "increase[ ][the] amount of cocaine" for resale. This process, known as "cut[ting]," "increases the amount of profit that [one] can make on any given amount of cocaine." "Cutting" cocaine is thus no more a part of a manufacturing process than was coating parsley with PCP in *Davis*. Both processes involve only the manipulation of a controlled dangerous substance already in its produced form.

As noted earlier, the term "manufacture" is defined by § 277(p) as "the production, preparation, propagation, compounding, conversion or processing of a controlled dangerous substance ... by means of chemical synthesis...." Consequently, the process of "cutting" cocaine must involve "chemical synthesis" to fall within the manufacturing process proscribed by § 277. Because the term "chemical synthesis" is

not defined in § 277, we must turn to extra-statutory authorities.

■ According to the McGraw–Hill Dictionary of Chemical Terms 83 (1984), a "chemical synthesis" is "[t]he formation of one chemical compound from another." And a "compound" is a "substance whose molecules consist of unlike atoms and whose constituents cannot be separated by physical means." *See id.* at 99, 570 A.2d 855. In other words, a chemical synthesis results in the creation of a new substance.

■ "Cutting" or, in other words, diluting cocaine by adding a substance that does not chemically alter cocaine, does not constitute a "chemical synthesis." Because the process of "cutting" cocaine is not a "chemical synthesis" and, therefore, does not involve the manufacture of cocaine, appellant's conviction for possession of a device adopted for the production of cocaine cannot stand.

### III.

Appellant was charged with three counts of second degree assault and one count of resisting arrest; all of these charges arose out of his scuffle with Officers Taylor, Drewer, and Purnell. Subsequently, the trial court found appellant not guilty of assaulting Officer Purnell, but guilty of assaulting Officers Taylor and Drewer, as well as resisting arrest.

Appellant contends that the trial court erred in declining to merge his assault convictions into his conviction for resisting arrest. In support of this contention, appellant argues that the only evidence supporting his convictions for assault consists of the same evidence underlying his conviction for resisting arrest. Or as appellant puts it, " '[T]here [were] no independent assaults in this case.' "

For that proposition, appellant relies on *Cooper v. State*, 128 Md.App. 257, 737 A.2d 613 (1999). In that case, the issue before this Court was whether to merge the defendant's two convictions for assault into his conviction for resisting arrest. In *Cooper*, the defendant purchased cocaine from an undercov-

er police officer. After that purchase, the defendant walked away and the undercover police officer notified an arrest team, sequestered nearby, of the completed transaction and defendant's attire.

One of the officers of the arrest team approached the defendant. When he attempted to make an arrest, the defendant punched him repeatedly in the head. Another officer moved in to assist with the arrest, and was struck in the face by the defendant. Other members of the arrest team then arrived and handcuffed the defendant.

When the defendant appealed his conviction to this Court, we applied the required evidence test to determine whether to merge the defendant's convictions for assault into his convictions for resisting arrest. The required evidence test " 'is a long-standing rule of law to determine whether one offense is included within another when both are based on the same act or acts.' " *See McGrath v. State,* 356 Md. 20, 24, 736 A.2d 1067 (1999) (quoting *State v. Lancaster,* 332 Md. 385, 409–10, 631 A.2d 453 (1993)). The test is: " 'if all of the elements of one offense are included in the other offense, so that only the latter offense contains a distinct element or distinct elements, the former merges into the latter.' " *See id.* at 23, 736 A.2d 1067 (quoting *Lancaster,* 332 Md. at 456–57, 631 A.2d 453.)

Applying that test, this Court in *Cooper* held that because all of the elements of assault are included in resisting arrest, and because the defendant's assault convictions stemmed from the same acts sustaining his conviction for resisting arrest, the defendant's convictions for assault merged into his conviction for resisting arrest. *See Cooper,* 128 Md.App. at 266, 737 A.2d 613.

*Cooper,* however, is factually distinguishable from the instant case. In *Cooper,* the defendant's assaultive behavior occurred in the course of his resisting arrest. Here, in contrast, appellant's assault on Officer Taylor, unlike his assault on Officer Drewer, occurred before any attempt was made to arrest him.

■ We therefore conclude that the circuit court properly convicted appellant of assault for striking Officer Taylor but, as the State conceded in its brief, improperly failed to merge appellant's conviction for assaulting Officer Drewer into his conviction for resisting arrest.

CONVICTION FOR POSSESSION OF AN INSTRUMENT ADOPTED FOR THE PRODUCTION OF CONTROLLED DANGEROUS SUBSTANCES REVERSED.

CONVICTION FOR ASSAULT ON OFFICER DREWER VACATED; JUDGMENTS OTHERWISE AFFIRMED.

COSTS TO BE PAID THIRTY PERCENT BY APPELLANT AND SEVENTY PERCENT BY WICOMICO COUNTY.