812 A.2d 342

STATE of Maryland,

v.

Jamar BROOKS, Latonia Brooks, and
Charlton Frederick Anderson.

Nos. 934, 935, 937, Sept. Term, 2002.

Court of Special Appeals of Maryland.

Dec. 6, 2002.

Rachel Marblestone Kamins, Asst. Atty. Gen. (J. Jospeh Curran, Jr., Atty. Gen., Baltimore and Joseph I. Cassily, State's Atty. for Harford County of Bel Air, on the brief), for ·Appellant.

Margaret A. Mead (Mead & Flynn P.A., on the brief for appellees, Jamar and Latonia Brooks), Baltimore. Counsel for appellee, Anderson adopts co-appellees' brief.

JAMES R. EYLER, GREENE, CHARLES E. MOYLAN, JR. (Ret., specially assigned), JJ.

CHARLES E. MOYLAN, Jr., Retired, Specially Assigned.·

It is a well-settled principle of law that an appellate court, when reviewing a suppression hearing ruling, will accept as the basis for its analysis that version of the evidence (as well as that version of the inferences that may be drawn from the evidence) most favorable to the prevailing party. The principle is self-evidently a two-edged sword. The State, far more frequently than not, wields that sword with triumphant gusto, as again and again defense evidence and defense arguments

are disdained as if non-existent. It is a stern standard.[1] On rarer occasions, however, it is the State that may be cut by that same sword. If there is a moral to this appeal, it is that those who are frequently content to live by the sword must accept the risk that occasionally they may die by the sword.

The appellees, Jamar Brooks, Latonia Brooks, and Charlton Frederick Anderson, were all indicted by the Grand Jury for Harford County under a five-count indictment, charging the possession of cocaine and a variety of related offenses. Prior to trial in the Circuit Court for Harford County, the appellees moved to have all the physical evidence suppressed as the fruit of a Fourth Amendment violation. Following a hearing on May 24, 2002, Judge Stephen M. Waldron granted the motion to suppress. Pursuant to Maryland Code, Courts and Judicial Proceedings Article, § 12–302(c)(3), the State has brought this appeal from that suppression hearing.

The physical evidence in question was all recovered as a result of a warrantless entry into a residence at 646 Harpark Court at 4:35 P.M. on June 1, 2001, by Deputy Gregory Young of the Harford County Sheriff's Department. The only issue before Judge Waldron was the Fourth Amendment reasonableness of that warrantless entry. He ruled that it was unreasonable. We hold that he was not in error in so ruling.

## The Nature of Our Holding

There is a single overriding question before us on this appeal. Although the circumstances of the warrantless entry are, of course, tangentially involved in our analysis, the primary question before us is not whether the warrantless entry was unreasonable. We do not know whether it was or not and

---

1. See, for instance, *Charity v. State*, 132 Md.App. 598, 606, 753 A.2d 556 (2000):

 At the suppression hearing the appellant himself testified, diametrically contrary to the testimony of Sergeant Lewis ... *For present purposes,* however, *we treat that testimony as if it had never been given.* Our ruling will be based exclusively on the State's most favorable version of the events.

 (Emphasis supplied).

it is not for us to say. We did not see or hear the witnesses. We have no localized sense of what had been happening in the area where the entry occurred or of what the general reputation of local law enforcement was for restraint or for zealousness. We are far removed from the ground where the action took place. We were not then, and are not now, called upon to make the quintessentially factual determination of whether the warrantless entry was unreasonable.

The far more limited issue before us is whether Judge Waldron was in error, as a matter of law, in making his determination that he deemed it to have been unreasonable. We hold that he was not. This case, therefore, does not stand for, and should not be cited for, the proposition that an evidentiary predicate indistinguishable from that in this case would necessarily require a conclusion that a warrantless entry based upon it would be unreasonable. Such an evidentiary predicate would, we hold, permit that conclusion, but it would by no means compel it. Had Judge Waldron, on the evidence before him in this case, reached the opposite conclusion that the warrantless entry was, indeed, reasonable and had the defendants appealed that hypothetical ruling, we would still have affirmed.

That we, at least tentatively, might think that, had we been at the suppression hearing, we would have ruled the entry in this case to have been reasonable is beside the point. Judge Waldron, in making a ruling that was rooted in fact-finding, in credibility assessment even in its more subtle and modest ranges, and in the weighing of the significance of even essentially undisputed evidence, was free to go either way, secure from appellate second-guessing. Our holding is· not that Judge Waldron **should** have made the ruling that he did, but only that he **could** have made the ruling he did.

This case, therefore, to the extent that it will be categorized, is not primarily a case about the Fourth Amendment. It is more significantly a case about the highly deferential standard of appellate review for essentially fact-based trial court rulings.

## The Community Caretaking Function

The State's theory of the case is that Deputy Young entered 646 Harpark Court not in an investigatory capacity but in the execution of his community caretaking function, as he responded to a scene of possible domestic violence. In *State v. Alexander*, 124 Md.App. 258, 266–80, 721 A.2d 275 (1998), we examined at length the community caretaking function of the police and its Fourth Amendment implications. We quoted with approval from 3 Wayne R. LaFave, *A Treatise on the Fourth Amendment*, § 6.6, pp. 389–90 (3d ed.1996), as Professor LaFave noted the distinction between entering a premises for investigative purposes and entering the same premises for other purposes.

> Preceding sections of this Chapter have been concerned with *the entry of private premises by police for the purpose of* arresting a person thought to be within or for the purpose of *finding the fruits, instrumentalities or evidence of some past crime. Although it is entries for those purposes which most often give rise to a motion to suppress,* requiring a ruling upon the validity of the entry and subsequent conduct of the police, *quite clearly police have occasion to enter premises without a warrant for a variety of other purposes.*

124 Md.App. at 266, 721 A.2d 275 (emphasis in original).

Professor LaFave, *id.*, went on to note the diversity of those other non-investigative purposes:

> *The police have complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses;* by design or default, the police are also expected to reduce the opportunities for the commission of some crimes through preventative patrol and other measures, aid individuals who are in danger of physical harm, assist those who cannot care for themselves, resolve conflict, create and maintain a feeling of security in the community, and provide other services on an emergency basis. *An entry and search of premises purportedly under-*

*taken for such reasons as these may sometimes result in the discovery of evidence of crime.*

*Id.* at 267, 721 A.2d 275 (emphasis supplied).

In *State v. Alexander,* we attributed the label "community caretaking function" to a 1973 Supreme Court decision:

What has been lacking for those other, non-investigative police functions is a convenient shorthand label. In the context of the police responsibility to handle vehicular accidents, *Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706, 714–15 (1973), chose, as a ready reference, the term "community caretaking function."

Local police officers ... frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described *as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.*

*Id.* (emphasis in original).

In *Stanberry v. State,* 343 Md. 720, 684 A.2d 823 (1996), the Court of Appeals placed its seal of approval on the label "community caretaking function" as it recognized the pivotal distinction between assessing police behavior when the police are "acting in their criminal investigatory capacity" and assessing police behavior when they are "acting to protect public safety pursuant to their community caretaking function." 343 Md. at 742–43, 684 A.2d 823. Judge Raker there wrote for the Court:

[A]lthough we find today that, under the circumstances presented in the instant case, the police search of Petitioner's luggage was unlawful, *we stress that our holding is limited to the conduct of the police when they are acting in their criminal investigatory capacity.* As the Iowa Supreme Court stated in discussing the rationale for the emergency-aid exception to the warrant requirement:

*In essence police officers function in one of two roles: (1) apprehension of criminals (investigative function); and (2) protecting the public and rescuing those in distress*

*(caretaking function).* Courts have noted that preservation of human life is paramount to the right of privacy protected by the fourth amendment. Thus the emergency-aid exception is justified because the motivation for the intrusion is to preserve life rather than to search for evidence to be used in a criminal investigation.

*State v. Carlson*[,] 548 N.W.2d 138, 141 (Iowa 1996) (citations omitted). *Our holding does not apply to situations in which the police are acting to protect public safety pursuant to their community caretaking function.*

(Emphasis in original).

### Avoiding Possible Analytic Confusion: Two Different "Exigency" Contexts

The community caretaking function embraces an open-ended variety of duties and obligations that are not directly involved with the investigation of crime. As we analyzed in *State v. Alexander,* 124 Md.App. at 269–73, 721 A.2d 275, one subcategory of community caretaking involves rendering emergency aid to those believed to be in distress or in need of that assistance. Another subcategory involves the protection of property. 124 Md.App. at 273–75, 721 A.2d 275. There are also situations, of course, involving the dual protection of both persons and property. 124 Md.App. at 276, 721 A.2d 275. The common denominator is that these instances of community caretaking arise in a context other than one involving the investigation of a crime or a search for evidence.

Linguistic or analytic confusion may be avoided if it is carefully noted 1) that exigency is a factor in the emergency aid and protection cases that are part of the community caretaking function, see, e.g., *Oken v. State,* 327 Md. 628, 643–47, 612 A.2d 258 (1992); *Lebedun v. State,* 283 Md. 257, 259–78, 390 A.2d 64 (1978); *Davis v. State,* 236 Md. 389, 395–98, 204 A.2d 76 (1964); and 2) that exigency is also a factor that sometimes justifies warrantless activity in the course of a criminal investigation, see, e.g., *Wengert v. State,* 364 Md. 76, 84–86, 771 A.2d 389 (2001); *Carroll v. State,* 335 Md. 723, 728–39, 646 A.2d 376 (1994); *Stackhouse v. State,* 298 Md. 203, 468

A.2d 333 (1983); *Burks v. State,* 96 Md.App. 173, 195–98, 624 A.2d 1257 (1993). It may be (we do not here decide) that the measure of exigency is the same in both contexts. Notwithstanding their common use of the term "exigency," however, it would seem helpful to keep the two contexts scrupulously distinct. As Professor LaFave, *op cit* at § 6.6(a), p. 390 n. 5, noted:

Though this "emergency aid exception" is one of many "community caretaking functions" of the police, it ... must be distinguished from "the exigent circumstance exception" ... for the former are only invoked when the police are not engaged in crime-solving activities.

### The Facts in This Case: The Initial Response

It is undisputed that the initial response of Deputy Young to 646 Harpark Court was in the reasonable execution of his community caretaking function. At 4:21 P.M. on June 1, 2001, the 911 emergency telephone center in Harford County received a telephone call in which no one spoke. A great deal of commotion and yelling, however, was heard in the background. After the call was disconnected at the caller's end, the dispatcher at the 911 center properly notified the Sheriff's Office. The dispatcher reported that the situation "sounds like a fight, sounds like it was going pretty good, then it disconnected."

A member of the Sheriff's Office immediately dialed the residence from which the 911 call had originated. The telephone was answered by a female, who subsequently identified herself as Latonia Brooks, one of the appellants. At first she stated that someone had dialed the wrong number. She then changed her story and said that her daughter had dialed 911. When the Sheriff's Office asked Latonia Brooks what was going on, she replied, "Nothing." The caller then informed her, "[We] could hear something in the background, we're coming anyway." At that point, there was audible in the background a male voice, yelling and cursing at the female for "calling the cops on him." Periodically, Latonia Brooks yelled back at the male voice. When the caller demanded to know what was going on, Brooks, sounding distressed, replied, "It's

nothing. I'm just arguing with him." When the call was again disconnected, the Sheriff's Office called back. An answering machine immediately came on.

Deputy Young was then dispatched to the scene to look "for a possible fight, domestic fight." He testified as to what had been told him:

> The information was that it was very heated inside the location. A 911 hang-up was the original call. The dispatchers were tying to make contact, and we were furnished with information that it was a heated argument.

Upon his arrival at the scene, Deputy Young was met by Latonia Brooks, standing in the doorway.

### The Unquestioned Propriety Of The Initial Response

It is beyond dispute that Deputy Young reasonably concluded that an emergency situation, involving possible domestic violence, existed when the 911 call was made and was probably still operational as he drove to 646 Harpark Court. Indeed, Judge Waldron concluded in this regard:

> We have a call made. We have the police going to the scene of a possible domestic dispute, which he certainly should. Thank goodness finally society is being sensitive to that. I used to practice domestic law when society was really not clued into domestic violence and I represented lots of women. Thank goodness that society has come around.
>
> . . . .
>
> I am glad he is there. He is supposed to be there and it sounds like he is very conscientious. He shows up.

If, when Deputy Young arrived at 646 Harpark Court, no one was about and no one responded to his knock at the door, it seems beyond dispute that he could have entered the premises warrantlessly. The single most important purpose behind the community caretaking function is to protect citizens from likely physical harm. In *State v. Alexander*, 124 Md.App. at 269–70, 721 A.2d 275, we discussed that overriding purpose:

Whether labeled a "community caretaking function" or not, one such duty is to aid persons in apparent need of assistance. If when glancing through the window of a home from the public sidewalk, for instance, the police see an elderly man clutch his chest and fall to the floor or even if they only see a prostrate figure already on the floor, their duty is to respond promptly to a possible medical emergency. Undue concern with Fourth Amendment niceties could yield a dead victim who might otherwise have survived.

In *Wayne v. United States,* 318 F.2d 205 (D.C.Cir.1963), Judge Warren E. Burger (later Chief Justice of the United States) articulated this overarching but often overlooked fact of police life:

[A] warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. Fires or dead bodies are reported to police by cranks where no fires or bodies are to be found. Acting in response to reports of "dead bodies," the police may find the "bodies" to be common drunks, diabetics in shock, or distressed cardiac patients. *But the business of policemen and firemen is to act, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process.* Even the apparently dead often are saved by swift police response. A myriad of circumstances could fall within the terms "exigent circumstances" * * *, *e.g.,* smoke coming out a window or under a door, the sound of gunfire in the house, threats from the inside to shoot through the door at police, reasonable grounds to believe an injured or seriously ill person is being held within.

(Emphasis supplied). *See also State v. Hetzko,* 283 So.2d 49 (Fla.App.1973) (the question is whether "the officers would have been derelict in their duty had they acted otherwise");

*State v. Plant,* 236 Neb. 317, 461 N.W.2d 253 (1990) (entry proper, as "had the police officers failed to enter the home to determine the well-being of the children, they may well have been derelict in their duty").

Professor LaFave, *op cit* at 396–400, catalogued a number of the diverse circumstances involving the entering of a premises in order to give aid to a person or protecting a person threatened with harm.

> *Doubtless there are an infinite variety of situations in which entry for the purpose of rendering aid is reasonable. Included are those in which entry is made* to thwart an apparent suicide attempt; to rescue people from a burning building; to seek an occupant reliably reported as missing; to seek a person known to have suffered a gunshot or knife wound; to assist a person recently threatened therein to retrieve his effects; to seek possible victims of violence in premises apparently burglarized recently; to assist a person within reported to be ill or injured; to rescue a person being detained therein; to assist unattended small children; to ensure a weapon within does not remain accessible to children there; *to respond to what appears to be a fight within; or to check out an occupant's hysterical telephone call to the police,* screams in the dead of the night, *or an inexplicably interrupted telephone call from the premises.* Entry may be justified even though the endangered persons are not in the premises, as where police entered premises in an attempt to discover what substance might have been eaten by several children who were critically ill.

(Emphasis supplied).

In *Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290, 300 (1978), the Supreme Court observed:

> We do not question the right of the police to respond to emergency situations. *Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid.* Similarly, when the police

come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises.

(Footnotes omitted; emphasis supplied). *Cf. Michigan v. Tyler*, 436 U.S. 499, 509–10, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978); *Thompson v. Louisiana*, 469 U.S. 17, 20–21, 105 S.Ct. 409, 83 L.Ed.2d 246, 250–51 (1984).

### Was the Emergency Still Extant When the Threshold Was Crossed?

In none of those situations, however, was the officer who responded to the apparent emergency 1) met by the person who was feared to have been the victim of the emergency 2) who then disclaimed the continuing existence of the emergency and 3) whose appearance and demeanor corroborated the disclaimer.

The problem is one of Newtonian momentum. Deputy Young was unquestionably an object in motion in the right direction. When possible brake lights appeared in his path, however, did his momentum carry him one critical step beyond the point where he should have stopped?

The question, therefore, was not whether the circumstances surrounding the 911 telephone call properly triggered the red alert. They unquestionably did. The issue, rather, was whether the emergency had dissipated prior to the warrantless crossing of the threshold and the red alert had turned green. If the transition from red to green was right on the cusp, moreover, who was responsible for making that close judgment call, what precisely was the judgment call supposed to decide, and by what standard will that judgment call be reviewed?

### Who Makes the Call on Community Caretaking And Precisely What Does It Decide?

In *State v. Alexander*, 124 Md.App. at 276–77, 721 A.2d 275, we explained the nature of the call in question:

When the police cross a threshold not in their criminal investigatory capacity but as part of their community caretaking function, it is clear that the standard for assessing the Fourth Amendment propriety of such conduct is whether they possessed a reasonable basis for doing what they did. Professor LaFave explained that the concern is with the basic reasonableness of an officer's belief that it is necessary to act:

"An objective standard as to the reasonableness of the officer's belief must be applied." Thus, *the question is whether there were 'reasonable grounds to believe that some kind of an emergency existed,' that is, whether there is 'evidence which would lead a prudent and reasonable official to see a need to act.' The officer must 'be able to point to specific and articulable facts which, taken with rational inferences from those facts, reasonably warrant that intrusion.'*"

(Emphasis in original).

■ The call that has to be made is not whether the officer on the scene **subjectively** believed that there was "a need to act." It is whether the historic facts, as found to exist by the suppression hearing judge, established, **objectively,** circumstances "which would lead a prudent and reasonable official to see a need to act." The judgment call thus required in this case was an objective assessment of whether the emergency was still extant. It was a call that was entrusted, moreover, to Judge Waldron. His call was that the emergency no longer existed. That being the case, there was no justification for the warrantless crossing of the threshold—unless his call is overturned for having been clearly erroneous. We turn now to the question of whether Judge Waldron had some evidentiary basis for finding as he did.

### The Facts in This Case: The Ultimate Crossing of the Threshold

The dispatch that sent Deputy Young to 646 Harpark Court was not, in and of itself, dispositive of his entitlement to cross

the threshold upon his arrival. Also important was the scene that presented itself to him upon his arrival.

Even in terms of momentum, Deputy Young's trip to 646 Harpark Court had been less than frenetic. With reference to the radioed information he was receiving from his dispatcher, he testified, "En route, they were telling me that the normal procedure was to be a normal drive to the location, not an emergency response." He did not speed. He did not activate his siren. Arriving at the scene, he did not screech to a halt and double-park in front of 646 Harpark Court. He parked "approximately two to three houses prior to 646 Harpark" and then walked to the scene.

The first thing that Deputy Young saw upon his arrival was indicative of tranquility. He "observed a young female anywhere from eight to twelve years of age exit 646 Harpark." On cross-examination, he described her demeanor more fully.

Q. Was she crying or distressed in any way?

A. No.

Q. Based on your observation, she was exiting that apartment?

A. It was a townhome. It looked as if she walked away from the front door of the residence.

Q. And the child seemed fine?

A. Yes, ma'am.

Indeed, in this regard Judge Waldron found:

Like I said, I am glad he is there. He is supposed to be there and it sounds like he is very conscientious. He shows up. *The first thing he sees is this young child walking peacefully away out of the residence, not running, not screaming, no sign of anything there other than peaceful life.*

(Emphasis supplied).

Deputy Young then made contact with Latonia Brooks, who was standing in the doorway of what was her residence.

[T]here was a female standing in the doorway. She was later identified as Latonia Brooks who resided at 646 Harpark Court.

I exited my vehicle to make contact with Ms. Brooks. She immediately told me I was no longer needed or I wasn't needed and did not need to be there.

Deputy Young's testimony was that Latonia Brooks was calm rather than excited.

Q. Did she seem upset?

A. Not really.

Q. Was she crying?

A. No, not really.

Q. Was she in any kind of—did you hear any yelling or screaming?

A. No, I did not.

Q. Would it be fair to say that Ms. Brooks seemed pretty calm?

A. For the most part, yes, ma'am.

In this regard, Judge Waldron found:

On cross-examination of the officer, *he saw no bruises. She is not upset. She is not crying. There is no screaming. She is calm for the most part.*

(Emphasis supplied).

On cross-examination, Deputy Young testified both as to Latonia Brooks's physical appearance and her appraisal of the situation.

Q. Now, a couple of questions I forgot to ask you on Ms. Brooks. In the way of her clothing or blood, did you see any disarray in her clothing?

A. No, ma'am.

Q. Did she tell you that everything was okay and she affirmatively stated you were no longer needed?

A. Yes.

One snippet of Deputy Young's testimony leant itself to judicial interpretation and evidentiary weighing. On his arriv-

al, he observed on the face of Latonia Brooks "a slight trickle of blood," which he characterized as "an injury."

As I was making contact with her, I observed a slight scratch to the left side of her face that had a slight trickle of blood coming down from it. It wasn't a severe injury, but it was an injury.

On a later occasion, he acknowledged that he had seen no bruises but he adverted again to the "cut."

Q. When you walked up to speak to Ms. Brooks, she wasn't crying or bruised and didn't seem distraught or upset; did she?

A. Bruises? She had the small cut.

On the basis of that "injury" or "cut" combined with the 911 call, Deputy Young apparently concluded that Latonia Brooks had been the victim of an assault.

Based on the information that I had received from the 911 call from the dispatchers, I believed that there was an assault that had taken place inside the location and something was wrong.

Although this observation by Deputy Young of an "injury" or a "cut" would be appropriate in a version of the evidence most favorable to the State, it does not exist as far as our present analysis is concerned. It is neither part of a version of the evidence most favorable to the defense nor was it a finding by Judge Waldron. Latonia Brooks did not recall any blood on her face that morning. She expressly denied having either a scratch or a cut. She testified that because of being eight months pregnant, she had a severe case of acne and that sometimes a pimple might "pop."

Q. What was the skin condition?

A. I had severe acne break-out from being pregnant. I was eight months pregnant.

Q. If you recall, on the day of June 1, 2001, were any parts of your face bleeding?

A. I had acne pimples that might have popped. I know it was a whole bunch of pimples on my face and I had zits.

Q. *Do you recall any blood on your face?*

A. *I don't recall if there was any blood on my face.* I did have so many zits; I really don't know.

Q. So, it was pretty obvious that you had acne?

A. Yes, real bad.

Q. *Did you have a scratch or cut on your face?*

A. *No.*

Q. Did you have to seek medical attention for any problem on your face?

A When the medic came, it was called because I was eight months pregnant. They wanted to take my blood pressure to make sure I was okay. *They never asked me anything about a cut on my face and they never even acknowledged a cut on my face.*

(Emphasis supplied).

For purposes of present analysis, therefore, there was no "injury" and there was no "cut." Although a version of the evidence most favorable to the defense would not even have a "trickle of blood," that version in that regard was "trumped" by the finding of Judge Waldron, *State v. Funkhouser,* 140 Md.App. 696, 704–05, 782 A.2d 387 (2001); *Charity v. State,* 132 Md.App. 598, 606, 753 A.2d 556 (2000), that there was a "trickle of blood." With respect to it, however, he accepted the fact that it was probably attributed to Latonia Brooks's case of acne.

Then, we have this trickle of blood. The officer says there was no trail of blood and, looking inside the door, no furniture toppled, no evidence of struggle. This little trickle of blood he described certainly fits the description of what the witness, Ms. Brooks, says: "Well, I had acne, and it could have been that something popped.

. . . .

[S]he was, in fact, pregnant at the time. So, maybe she did. So, that would be consistent. The bottom line is that it was a minimal scratch at most.

That is the sum total of the evidence as to the circumstances found by Deputy Young when he arrived at 646 Harpark Court. A young child was peacefully walking away from the house. Latonia Brooks was standing in the doorway. Although there was on her left cheek a trickle of blood compatible with a "popped" pimple from her severe acne condition, she showed no signs of cuts or injuries. Her demeanor was calm and her appearance was neither rumpled nor disheveled. She told Deputy Young, moreover, that he was no longer needed.

That disclaimer alone, of course, was not dispositive, as Judge Waldron acknowledged:

> [T]he mere fact that a potential or probable domestic violence victim says, "I am okay,"—I mean, if Ms. Brooks had blood streaming down her face and is saying, "I am okay," that doesn't end it; but what do we have?

In addressing the question "What do we have?," Judge Waldron had to look at the totality of the evidence before him, which he did. In arguing its case of emergency need, the State relied primarily on the theory that Latonia Brooks, from her initiation of the 911 call through Deputy Young's arrival at the scene, was at all times the likely victim who needed to be protected from possible domestic violence. In his exchange with the assistant state's attorney, Judge Waldron demolished that justification for the warrantless crossing of the threshold.

> THE COURT: *She is outside.*
>
> MR. GENTILE: She is outside.
>
> THE COURT: *He is obviously not going in to make sure she is okay.* You don't have to go anywhere. *He has got her in the doorway.*
>
> MR. GENTILE: There were two voices.
>
> THE COURT: *Don't argue to me that he is doing this to protect her because she is already right there.* He didn't have to go look for her. *She is smack dab in front of him.*

(Emphasis supplied).

The protection of Latonia Brooks from domestic violence, therefore, could not possibly have been a part of any exigency

equation justifying the crossing of the threshold.[2] Whatever may have earlier happened, as she stood on the front doorstoop with Deputy Young, she was in a place of asylum and she expressly disclaimed any need for future protection. Any exigent fears for her safety had come to rest.

## Judge Waldron's Ruling That the Evidence Be Suppressed

In rendering his ruling, Judge Waldron focused specifically on what exigency existed at that point to justify going into the house.

Were there exigent circumstances under the facts presented to the Court to warrant the officer to enter that house? That is what we are talking about, going [across] the threshold, going into the home.

At the very outset of the suppression hearing, Judge Waldron had made it clear that the critical issue was not the emergency response to the scene but the necessity, in the course of that response, of entering the home itself.

What I am listening to and what is really the critical issue here is the initial entry into 646 Harpark Court?

Deputy Young labored under the belief that merely responding to the call automatically entitled him to enter the residence.

I told Ms. Brooks that we needed to go inside to determine what was going on. She insisted that we not go inside.

---

**2.** The State also suggests that someone other than Latonia Brooks might have been injured inside the house, presumably by Latonia Brooks herself. Under the circumstances of the 911 call in this case, if the apparent victim of the violence had not been standing in the doorway and if no one had responded to the officer's knock at the door, an exigent entry, out of concern for the apparent victim, might have been justified. It would be pushing out the envelope perhaps beyond its breaking point, however, to suggest that the imperative of protecting against domestic violence extends not only to protecting likely victims from their assailants but to protecting likely assailants from retaliation by their victims. In any event, no cogent argument in that regard was advanced by the State.

*I told her, due to the nature of the incident, I had to go inside.*

(Emphasis supplied).

Deputy Young had no automatic right "to go inside." It was his burden to prove such an entitlement. Judge Waldron ruled that the State had not met its burden of establishing an exigency to justify the warrantless crossing of the threshold.

What doesn't take place? Well, the officer does not ask her outside. "Let's check it out." He doesn't ask outside what happened.

. . . .

Certainly I have to applaud the officer for responding and for trying to get to the bottom of this. However the entry in this case—the facts do not support it. *The State has the burden. I don't think the State has met that burden,* so the Court will grant the Defendants' motion, and *I will suppress the evidence.*

(Emphasis supplied).

### Two Converging Standards of Appellate Review Strongly Favor Affirming the Trial Court

As the State seeks to have us reverse that ruling, it is swimming against a strong current. Two distinct but closely related review standards reinforce each other in support of Judge Waldron's ruling. Both display strong appellate deference to the trial court.

### The "Most Favorable Version" Standard

The first is that which takes that version of the evidence most favorable to the prevailing party. That standard is not concerned with the judge's actual findings of fact as such. That standard is concerned with evidentiary supply rather than decisional execution. The appellate court looks to the judge's ruling itself, even in the absence of any supportive fact-finding, and it then looks to the entire body of the evidence and searches for any scenario that could have supported the trial court's ruling in favor of the prevailing party.

In the absence of actual findings and nothing but an unadorned ruling, the standard is concerned with what **could** have been found.

It is with respect to this aspect of review that we take, as our basis for review, that version of the evidence most favorable to the prevailing party. Almost invariably, the prevailing party with respect to such a review will end up as the appellee. In *State v. Funkhouser,* 140 Md.App. at 700–01, 782 A.2d 387, we described the overwhelming advantage thereby enjoyed by the appellee:

> In the criminal appellate process, adversaries do not always meet on a level playing field. *The question of who possesses the advantage,* however, is not a matter of status as State or as defendant. It *is rather the ad hoc circumstance of which party,* on a given occasion, *enjoys the luxury of being the appellee and which suffers the burden of being the appellant. There is a strong presumption—a discernible "tilt" of the playing field—in favor of the status quo.*

(Emphasis supplied).

It is this appellate posture of the case that makes the State's reliance on *Grant v. State,* 141 Md.App. 517, 786 A.2d 34 (2001) inapt. On the surface, that case would seem to have an obvious appeal in that it involved 1) an "open" 911 call in which no one speaks but in which sounds of fighting are heard in the background and 2) the responding officers' being met by a woman who reassured them that "everything was okay." In the *Grant* case, however, the ultimate warrantless crossing of the threshold by the police was made pursuant to the voluntary consent of a resident and was not, moreover, an issue on appeal. "[A]ppellant does not challenge the right of the police to enter the apartment after obtaining the consent of Ms. Huntley to do so." 141 Md.App. at 528, 786 A.2d 34. The exigency issue in that case involved the further entry into and search of the appellant's bedroom after incremental suspicious circumstances occurred following the initial entry.

Even more foreclosing to the State's reliance on *Grant,* however, is the procedural posture of that case. In *Grant,* the suppression motion was denied and the State was, therefore, the prevailing party. That is not the procedural posture of this case. In a wide range of ambiguous and contested factual situations, the hearing judge will be affirmed, whichever way he rules. The fact that we affirmed the hearing judge in that case by no means suggested that we would not also have affirmed him if he had ruled the opposite way. Any case, therefore, in which the suppression motion was denied and the State was the prevailing party is not going to be a helpful precedent for the State in its present procedural posture.

## The "Clearly Erroneous" Standard

The second and reinforcing review standard involves the deference to the trial judge's fact-finding, the acceptance of it as proper (even if the appellate court thinks it might have found otherwise) unless it is held to have been clearly erroneous. On a suppression motion, the hearing judge is almost always a fact-finder as well as a legal referee. The fact-finding of a trial judge (or hearing judge) is rarely held to have been clearly erroneous. The clearly erroneous standard, however, for all of its longevity, is not always fully understood. It needs periodic explication.

### A. "Clearly Erroneous" Fact–Finding Is Not a Factual Issue But a Legal Issue

A conclusion that a verdict generally or a finding of fact specifically is clearly erroneous is not a wild card that appellate courts may freely play (although they sometimes do) whenever they strongly disagree with a trial judge's fact-finding. If faithfully applied as it has been regularly defined, a clearly erroneous holding should be limited to a situation where, with respect to a proposition or a fact as to which the proponent bears the burden of production, the fact-finding judge has found such a proposition or fact without the evidence's having established a *prima facie* basis for such a proposition or fact. The holding should be confined to situa-

tions where, as a matter of law, the burden of production has not been satisfied.

A finding of fact should never be held to have been clearly erroneous simply because its evidentiary predicate was weak, shaky, improbable, or a "50–to–1 long shot." A holding of "clearly erroneous" is a determination, as a matter of law, that, even granting maximum credibility and maximum weight, there was no evidentiary basis whatsoever for the finding of fact. The concern is not with the frailty or improbability of the evidentiary base, but with the bedrock nonexistence of an evidentiary base.

It is akin to holding, as a matter of law, that the evidence was not legally sufficient to support a verdict. It is not akin to a judge's ruling, in awarding a new trial, that in his judgment the verdict was, as a matter of fact, against the weight of the evidence. (A type of discretionary ruling that permits a new trial but does not compel a reversal.) See *Tibbs v. Florida,* 457 U.S. 31, 36–47, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The trial judge must be logically wrong, as a matter of law, and not merely probably wrong, as a matter of fact.

The holding that a judge has been clearly erroneous in a court trial requires, of course, the same assessment by the appellate court of the evidentiary base that must be made when, in a jury trial, the holding is that the evidence was not sufficient to have permitted the trial judge even to submit the case to the jury. The error is not with fact-finding *per se* but with the threshold legal decision even to submit the issue to the fact-finding process. *Williams v. State,* 5 Md.App. 450, 458, 247 A.2d 731 (1968); *Smith v. State,* 145 Md.App. 400, 435–36, 805 A.2d 1108 (2002) (Dissenting opinion by James Eyler, J.).

When, on the other hand, a judge has some evidentiary basis that legally permits him to consider the existence of a fact, what he then decides, as a matter of fact, is beyond the challenge of the "clearly erroneous" test, even if in the minds

of many his factual conclusion seems highly questionable. We do not second-guess the decisional process, as a matter of fact. We may only determine, as a matter of law, that there was no basis even for engaging in the decisional process.

## B. What Is a Fact?

At the simplest level, fact-finding is a determination based on evidence, undisputed or conflicting, that certain historic events occurred or certain phenomena existed. The state of Latonia Brooke's left cheek is a case in point. In the State's best version of the evidence, there was blood on that cheek indicating that she had been recently cut or injured. In the defense's best version of the evidence, there was no blood whatsoever. Trumping both of those extreme versions, however, was the express finding of fact by Judge Waldron that there was a small trickle of blood on the cheek, probably attributable to Latonia's severe case of acne. There was evidentiary support for such a finding of fact and it was, therefore, not clearly erroneous.

At a slightly higher level of abstraction, moreover, the issue of whether the state of emergency that brought Deputy Young to 646 Harpark Court 1) still possessed the generative force to propel him reasonably across the threshold or 2) had diminished sufficiently to lose that generative force was also a question of fact. Although the ultimate question of whether the warrantless crossing of the threshold was, within the contemplation of the Fourth Amendment, reasonable involves a conclusory or constitutional fact calling for an independent *de novo* determination by this Court, the antecedent question of whether an emergency still existed was a question of fact calling for a finding by Judge Waldron.

The resolution of our possible *de novo* question is easy: if the emergency still existed, the warrantless entry was reasonable; if the emergency no longer existed, the warrantless entry was unreasonable. The reasonableness of the warrantless entry is a question of constitutional law. The continuing existence of the emergency, by contrast, was a question of

fact. Although the two questions are closely related, they lie on opposite sides of the great "*de novo*" divide.

Judge Waldron found, as a matter of fact, that the emergency no longer existed. Our only question is whether that finding of fact was clearly erroneous. There was in 1) the young child's walking peacefully away from the house, 2) the position of Latonia Brooks in the safe haven of the doorway, 3) the appearance and demeanor of Latonia Brooks, and 4) the express words of Latonia Brooks, some evidentiary basis from which some fact-finder at some time somewhere somehow could have concluded that an emergency no longer existed. By definition, therefore, the conclusion of Judge Waldron in that regard was not clearly erroneous.

## C. Deference to the Weighing of Evidence

There is more to the fact-finding to which appellate courts extend deference than the brief listing of half a dozen historic events that were found to have occurred. The State lists four or five such historic events and asks us to judge, essentially on paper, their significance as if they all had equal weight. We, however, do not know what weight those factors may have been given and it is not for us to say.

It is an appellate commonplace that the weighing of evidence and the assessing of credibility are functions within the exclusive prerogative of the fact-finder. The appellate court may not, cannot, and does not do either of those two things. In this case, for instance, the nature of the 911 call was a fact indicating the existence of an emergency. The child walking peacefully from the scene, on the other hand, was a fact indicating that the emergency had abated. Judge Waldron was entitled to weigh each of those factors (and others, of course) as his exclusive prerogative. If he gave more weight to the 911 call than to the tranquil child, he could have found that the emergency was still extant. If, on the other hand, he gave more weight to the tranquil child (as being closer in time, perhaps, to the critical decision) than to

the 911 call, he could have found that the exigency had subsided. Only he could weigh the factors. We cannot.

 Our deference to Judge Waldron's fact-finding, therefore, is not limited to our acceptance of half a dozen express findings. It includes, significantly, this weighing process. It is not necessary, moreover, that Judge Waldron articulate his every thought process. We give him the maximum benefit of the doubt in that regard.

## D. Deference to the Assessing of Credibility

 Appellate courts regularly intone the principle that the assessing of the credibility of witnesses is the exclusive prerogative of the fact-finder. The full implications of that principle, however, are not always grasped. The assessment of credibility is not limited to instances where competing witnesses give conflicting testimony. Fact-finders, consciously and subconsciously, assess the credibility of every witness who takes the stand. They get an impression of the witness. They size the witness up. That is why the law places great value on the ability of the fact-finders to see and to hear the witnesses and to observe their demeanor and manner of testifying.

 The assessment of a witness's credibility, moreover, is not limited to a simple black-or-white determination of who, in the grossest sense, is lying and who is telling the truth. Assessing credibility means more than marking a "true or false" test. It reaches down to far deeper and more subtle assessments. There could readily be an assessment of a witness by a fact-finder such as, "I believe the witness is essentially telling the truth as he sees it. I also have the feeling, however, that the witness has a tendency to exaggerate, is prone to seeing things in the light most favorable to his own position, and might well react overzealously to circumstances as he perceives them." A fact-finder does not have to believe a witness is lying to take a witness's testimony with a grain of salt.

It is in this more subtle realm, perhaps, that the assessment of a witness's credibility and the weighing of the witness's testimony converge into a single decisional phenomenon. It is such psychic phenomena on the part of the fact-finder, subconscious as well as conscious, to which appellate judges, who have not themselves observed the demeanor or manner of testifying, properly defer.

We do not know Judge Waldron's reading of Latonia Brooks. Did she strike him as straightforward or as devious? We do not know Judge Waldron's appraisal of Deputy Young. Did he appear as someone honest and dedicated, but possibly a bit overimpetuous? Did he appear as someone whose commendable commitment to his primary mission might cloud his solicitude for a citizen's rights? We cannot know the answers to these questions and countless questions like them. Judge Waldron, perhaps, was not fully conscious of the answers himself. What is being reviewed is a total decisional phenomenon, consisting of feeling and sensing as well as of thinking. This is why judgment from afar can never substitute itself for the judgment on the field.

### A Stern Test

Just as the exclusive prerogative of the fact-finding trial judge to weigh the evidence and to assess the credibility of witnesses is taken into account when we review the judge's fact-finding for clear error, so too must it be taken into account when we determine that version of the evidence most favorable to the prevailing party. The most favorable version is not limited to a finite set of historic events listed on a yellow pad. The most favorable version also includes the most favorable weighing of those factors favoring the prevailing party. The most favorable version also includes the possible assessment of the credibility of the witnesses to the maximum advantage of the prevailing party.

For the State in this case, this obviously was a stern test. The State chose to be the appellant, however, and for appellants such stern tests come with the territory. Our observa-

tion in *State v. Funkhouser*, 140 Md.App. at 706, 782 A.2d 387, is appropriate:

> [T]he lesson of this decision is that our resolution of the issue would have been a diametrically opposite one had the roles of appellant and appellee been reversed. The respective appellate postures of the parties, therefore, will frequently be controlling on such issues.

### A Scope Violation Beyond the Initial Breach

As was cogently explained by *Coolidge v. New Hampshire*, 403 U.S. 443, 467–68, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), the Fourth Amendment guards against two very different types of unreasonable intrusions. The first is an unwarranted breach into the zone of protected privacy. The value being guarded is symbolized by the notion of one's home as one's castle. Even following a justifiable intrusion into the zone of privacy, however, there may still occur a violation when the intrusion strays beyond its legitimate purpose. Such an unreasonable incremental intrusion is called a scope violation. The fear is that even an initially good search may, if not scrupulously limited, degenerate into a general rummaging about.

If the initial entry is unreasonable, as Judge Waldron ruled in this case, there is no need to go on with the analysis. Even if, however, our affirmance of Judge Waldron's ruling with respect to the initial entry, were, *arguendo*, incorrect, it would still be the case that the evidence was properly suppressed because of a subsequent scope violation.

Deputy Young's initial crossing of the threshold did not produce any knowledge of the narcotics that were ultimately recovered. He and Latonia Brooks, over her protest, stepped "just inside the doorway," into the living room area. It was there that he further debriefed Latonia and learned from her that the source of the earlier trouble had been her boyfriend, Charlton Anderson, and that the boyfriend was now gone. There was in the living room no broken or overturned furniture or other signs of a disturbance. In the affidavit for a

subsequent search warrant, which was introduced into evidence, it was said with respect to Latonia Brooks:

> She did advise that she was in an argument with her boyfriend, who was now gone.

Judge Waldron, moreover, made an express finding of fact with respect to that advisement:

> If you take a look at the exhibit, State's 1, in the affidavit, in the living room, we find out that *there was an argument with the boyfriend, who is now gone.* If there is a problem, *he is being told that the problem is gone.* You are not seeing signs of a struggle. You are not hearing anything else.

(Emphasis supplied).

That probably superfluous finding of fact was that at that late moment, if not before, certainly any exigency or emergency had come to an end. There was no conceivable necessity for any further search of the house. Deputy Young asked who else, if anyone, lived in the house and was told that Latonia's brother, Jamar, was upstairs. At Deputy Young's direction, Latonia called Jamar two or three times, but received no answer. Deputy Young testified as to his reasons for then walking upstairs.

> *In fear that* he may be involved in the incident and he may be injured or *somebody else may be injured or hiding* upstairs, I immediately started up the steps to the second floor to determine what was going on.

(Emphasis supplied).

The problem with Deputy Young's expressed justification that "somebody else may be injured or hiding" is that it would apply whether Jamar had answered or not. It would still have applied even if Jamar himself had come downstairs. "Somebody else may be injured or hiding." It would apply irrespective of whatever Latonia had said, for Deputy Young showed no inclination to believe her. The proffered justification would extend to the basement as well as to the upstairs and to all points between. It would presumably authorize looking into every closet and under every bed. The 911 call could not

remotely have justified, over the homeowner's protest, that kind of a "sweep."

At the top of the stairs, Deputy Young discovered the presence of Jamar, who was in his bedroom, sitting on a bed. From the doorway of the bedroom, Deputy Young could see in plain view "a clear plastic sandwich bag with numerous small pink Ziploc baggies containing a substance which I believe to be crack cocaine." On the basis of that plain view observation, a search warrant for the house was applied for and subsequently executed.

Shorn of all elaboration, Judge Waldron's bottom-line conclusion was that the original community caretaking concern, no matter how nobly motivated initially, had been stretched beyond its breaking point.

■ Our secondary holding is that, **GIVEN THAT THE EMERGENCY HAD ABATED,** the warrantless entry was, therefore, constitutionally unreasonable. Our primary holding is that Judge Waldron was operating within his legitimate fact-finding range in considering whether the emergency had abated. Given that, whatever he decided in that regard could not have been, and was not, clearly erroneous.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY HARFORD COUNTY.**