78 A.3d 887

**Jean Paul BUTLER**

v.

**STATE of Maryland.**

**Nos. 176, 177, Sept. Term, 2012.**

Court of Special Appeals of Maryland.

Nov. 1, 2013.

Mark Colvin (Paul B. DeWolfe, Public Defender, on the brief) Baltimore, MD, for appellant.

Todd W. Hesel (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: ZARNOCH, NAZARIAN, RAYMOND G. THIEME, JR. (Retired, Specially Assigned), JJ.

NAZARIAN, J.

Jean Paul Butler challenges his convictions for possession of controlled dangerous substances ("CDS"), possession with intent to distribute, and possession of a device adapted to produce a CDS. He contends that the Circuit Court for Harford County committed several errors: by accepting and then holding him to his waiver of the right to a jury trial; by denying his motion to suppress; by denying his motion to dismiss for lack of a speedy trial; and by failing to introduce evidence sufficient to convict him of possessing a device adapted to produce a CDS. We hold that because the circuit court did not make the findings required by *Valonis v. State*, 431

Md. 551, 66 A.3d 661 (2013), we are compelled to reverse his convictions and remand for further proceedings not inconsistent with this opinion. And in the course of addressing (and rejecting) Mr. Butler's other contentions, which are likely to recur on remand, we hold that the digital scale found in his car could properly have been found to be "a machine, equipment, instrument, implement, [or] device ... adapted to produce a controlled dangerous substance" for purposes of Md.Code (2002, 2012 Repl.Vol.), § 5–603 of the Criminal Law Article ("CL").

## I. BACKGROUND

On October 21, 2008, Harford County Sheriff's Detective Christopher Sergent was working as an off-duty security officer at the Woodbridge Shopping Center in Edgewood. As he watched the Center's security monitor, he noticed what appeared to him to be a drug transaction:

There was [Mr. Butler's] vehicle backed into a parking spot on the side of the building directly next to the Advance Auto Parts store. That vehicle was backed into a spot, and there was one subject in the driver's seat [Mr. Butler] who I could only observe as a black male, and there was a second passenger in the front passenger seat, I couldn't see any further description on him or her at that time. I did observe the driver holding what appeared to be a plastic bag that contained an unknown material and was tied off. He handed that baggie to the subject in the passenger seat, that baggie was then passed back to the driver, which was then put into the center console of the vehicle. The vehicle then pulled off from the parking spot into the front area of the parking lot in front of the Advance Auto Parts, where the white male passenger exited the passenger side of the vehicle and entered a black-in-color pickup truck, which then left the parking lot.

Detective Sergent further identified the object being handed back and forth as being "a clear plastic baggie with a substance in the bottom of it, and also appeared to be tied off at

the top, which is common in drug transactions." He also testified that the substance at the bottom of the bag "appeared to be blue." Although the tape of the transaction shown at the suppression hearing (and later the trial) was somewhat "jumpy"—it was digital and skipped as it moved from frame to frame—Detective Sergent testified that the live-feed view he had through the security camera made for a clear visual: "[l]ooking through the [monitor] it's real time and everything flows as it would if you saw it with your eyes ... It's smooth and the images are as detailed as they would be if you were looking directly."

Detective Sergent based his conclusion that a drug deal likely had just taken place not only on *what* he saw take place in the car, but also *where* the parties met, *i.e.*, in a remote corner of the parking lot:

Q: And how much of the public parking lot is visible from where [Mr. Butler] parked his car?

\*　　　\*　　　\*

A: Very little.

\*　　　\*　　　\*

Q: And if you are in the public parking lot, how much of the area where the defendant was parked is visible?

A: I'm assuming only if you were on that far row of spots, but aside from that, I'd say none of the parking lot.

After seeing the transaction unfold, Detective Sergent got in his patrol vehicle (which was in the parking lot at the shopping center), and pulled Mr. Butler over as he tried to leave the parking lot. He told Mr. Butler that he had "observed what [he] believed to be a drug transaction on surveillance video" and asked if he had anything illegal inside the vehicle. Mr. Butler responded that the passenger had left "a substantial quantity of pills in the center console in a clear plastic bag that was tied off." Detective Sergent ultimately recovered eighty 30–milligram pills, later confirmed to be oxycodone, from Mr. Butler's car. He also searched Mr. Butler and

found two oxycodone pills and fifty dollars cash in his front pants pockets and twelve dollars cash in his rear pocket.

Detective Sergent also found a digital scale in the back seat of Mr. Butler's car. Christine Burns, a forensic chemist with the Maryland State Police, testified that the residue on the scale tested positive for cocaine. A second detective, Detective Matthew Glassman, testified at trial as an expert in narcotics enforcement and explained the significance of the scale with cocaine residue on it:

Q: How, if in any way, would that be used to facilitate the manufacturing, packaging and distribution of narcotics?

A: Not for use. I have never seen it for sale of pills, but for the sale of any other illegal drugs; cocaine, marijuana, heroin.

Q: How is it used for cocaine distribution?

A: To weigh out proper amounts. A drug dealer doesn't want to give out more than he has to, so he is going to use the scale to properly weigh the product prior to the sale.

\* \* \*

Q: Based upon your training, knowledge and experience, what, if anything, happens when that scale is used and comes in contact with cocaine and the scale is recovered later on? What, if any, significance would there be if there was a residue of cocaine on that scale?

A: It would show prior use.

Mr. Butler conceded at trial that he knew the scale contained cocaine residue and that it was in the car.

Mr. Butler testified on his own behalf, and identified the passenger in the car at the time of his arrest as Keir Thompson, his friend of five or six years. According to Mr. Butler, Mr. Thompson sold him the pills that Detective Sergent recovered for Mr. Butler's own use and not for distribution. Mr. Butler claimed he lied to Detective Sergent when he said the pills belonged to his friend in an effort to hide his own addiction from his family.

The events of October 21 led to two separate indictments. In the *first*, Case No. 12–K–08–001890 (Circuit Court for Harford County) (the "2008 case"), Mr. Butler was indicted on November 12, 2008, for (1) possession of oxycodone with intent to distribute; (2) possession of oxycodone; and (3) possession with intent to use drug paraphernalia (the scale). In the *second*, Case No. 12–K–10–001757 (Circuit Court for Harford County) (the "2010 case"), he was indicted on November 3, 2010, for (1) possession of cocaine with intent to distribute; (2) possession of cocaine; (3) manufacture of cocaine; (4) possession with intent to use drug paraphernalia (a scale); (5) maintaining a common nuisance (his car) "for purposes of the illegal manufacturing, distribution, storage and concealment" of CDSs; and (6) possession of the digital scale, which was adapted for production of CDSs. The record does not indicate why the second indictment was not brought until 2010,[1] but in any event the cases were consolidated for trial by Order dated November 19, 2010.

Following a two-day bench trial on December 8 and 9, 2011, the trial court found Mr. Butler guilty on all three counts in the 2008 case and two of the counts from the 2010 case, possession of cocaine and possession of the scale adapted for production of CDSs. The court sentenced Mr. Butler to twenty years' incarceration (with a mandatory minimum of ten years) for possession with intent to distribute oxycodone (this sentence merged the convictions for possession of oxycodone and cocaine); two years (to be served concurrently) for possession of paraphernalia; ten years (five suspended), consecutive to the twenty-year sentence, for possession of the scale; and five years of post-release supervised probation. Mr. Butler filed a timely appeal in each of the two cases, which were consolidated here for briefing and argument before this Court.

---

1. The State's forensic chemist testified at trial that she performed the chemical analysis on the scale, which ultimately tested positive for cocaine, in October 2010, which could explain the timing of the second indictment. Whatever the reasons, Mr. Butler does not raise on appeal any issues relating to the timing of the indictments.

We discuss additional facts that pertain to specific issues below.

## II. DISCUSSION

Mr. Butler challenges on appeal a number of different (and unrelated) rulings the circuit court made before and during his trial, as well as the sufficiency of the evidence supporting his conviction for possession of the scale adapted for the production of a CDS. For reasons that will become apparent, we have reordered, rephrased and consolidated the issues: [2]

1. Did the trial court properly announce on the record Mr. Butler's waiver of a right to jury trial, and did it err in refusing to permit him to withdraw that waiver?

2. Did the trial court properly decline to suppress the evidence found in Mr. Butler's car after what he claims was an illegal stop of his car, not based on reasonable suspicion by Detective Sergent that a crime had occurred?

3. Did the trial court properly decline to dismiss the 2008 case for lack of a speedy trial?

4. Was the evidence sufficient to convict Mr. Butler for possession of a device adapted to assist in the production and distribution of a controlled dangerous substance?

The answer to the first question comes from *Valonis v. State*, 431 Md. 551, 66 A.3d 661 (2013), which issued after the

---

2. Mr. Butler phrases the questions presented as follows:
 1. Did the trial court err in denying the motion to suppress?
 2. Did the trial court err in denying the motion to dismiss for lack of a speedy trial in [the 2008 case]?
 3. Must the convictions in this case be reversed because the trial court failed to "determin[e] and announc[e] on the record" that [his] waiver of his right to a jury trial was made knowingly and voluntarily, as required by Md. Rule 4–246(b)?
 4. Did the trial court err in refusing to permit Mr. Butler to withdraw his waiver of the right to a jury trial?
 5. Is the evidence insufficient to sustain the conviction for possession of a device adapted to produce a controlled dangerous substance?

parties' briefs were filed and which drives the overall outcome of this appeal: because the circuit court's short examination of Mr. Butler regarding his desire to waive a jury trial did not culminate in a finding by the court that he waived that right voluntarily and knowingly, we must reverse his convictions and remand for further proceedings.

From there, because it is "necessary and desirable for the guidance of the lower court and to avoid the expense and delay of another appeal to this Court," we review Mr. Butler's other contentions. *Midgett v. State*, 216 Md. 26, 38, 139 A.2d 209 (1958); *see also Battle v. State*, 287 Md. 675, 684–85, 414 A.2d 1266 (1980). We conclude that the circuit court correctly declined to suppress the evidence found in Mr. Butler's car and that the delays in getting to trial did not deprive him of his constitutional right to a speedy trial, but rather represented the typical problems of an overcrowded court system and caused Mr. Butler no demonstrable prejudice in any event.

*Finally,* we are compelled to address Mr. Butler's claim that the evidence was insufficient to convict him for possession of a device adapted to produce a CDS because if we were to agree with him on this issue, he could not be retried on that charge on remand. *See Winder v. State*, 362 Md. 275, 324–25, 765 A.2d 97 (2001) (explaining that if we hold that the evidence admitted at trial was insufficient to sustain a conviction, the Double Jeopardy Clause forbids a retrial simply because of the prosecution's failure to present sufficient evidence the first time around (citing *Burks v. United States*, 437 U.S. 1, 11, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978))); *Markham v. State*, 189 Md.App. 140, 169, 984 A.2d 262 (2009) (" 'When a defendant's conviction is reversed by an appellate court on the ground that the evidence is insufficient to sustain the jury's verdict, the Double Jeopardy Clause bars a retrial on the same charge.' " (quoting *Lockhart v. Nelson*, 488 U.S. 33, 39, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988))). Ultimately, we disagree with Mr. Butler, primarily because we hold that the General Assembly's amendment to § 5–603 of the Criminal Law Article expanded that offense to cover packaging equipment such as the scale found in his car.

**A. The Convictions Must Be Reversed Because The Trial Court Did Not Make An On–The–Record Finding That Mr. Butler Waived His Jury Trial Knowingly And Voluntarily.**

 Although it was not his first trial date (or his last), Mr. Butler was scheduled for trial on February 7, 2011. The trial did not proceed that day—the circuit court postponed it after addressing Mr. Butler's request to waive a jury trial and denying his motion to dismiss some of the charges on speedy trial grounds (more on that below).[3] The court discussed Mr. Butler's request to waive a jury trial briefly with him before granting it, and we reproduce the colloquy in full:

> THE COURT: After some discussion with [defense counsel], it's my understanding that you wish to go to trial and have your case tried by me, correct?
>
> [MR. BUTLER]: Yes, Your Honor.
>
> THE COURT: Okay. Now, you understand that what I am going to do is I am going to dismiss the jury, you understand that?
>
> [MR. BUTLER]: Yes, Your Honor.
>
> THE COURT: And you understand that if you had a jury trial, all twelve jurors would have to agree that you were guilty and they would also have to agree that you were guilty beyond a reasonable doubt. So that you're waiving your right to a trial by jury, you're going to have your case tried by me and I am going to let the jury go home. Do you understand that?
>
> [MR. BUTLER]: Yes, Your Honor.

Mr. Butler's counsel did not object at the time, nor did counsel offer Mr. Butler any further explanation on the record about the nature and consequences of the waiver. Nevertheless, Mr. Butler argues in his brief that his waiver was invalid because the court failed to comply with Maryland Rule 4–246(b). The State counters that the waiver complied with that

---

**3.** We refer to that day's proceedings as the "February 7 Hearing."

Rule because the dialogue showed that Mr. Butler knew his rights and waived them voluntarily.

The right to a jury trial is guaranteed under the United States and Maryland Constitutions, and a criminal defendant's decision to waive a jury trial is not taken lightly. U.S. Const. amend. VI, XIV, § 1; Md. Decl. of Rts. Art. 5, 21, 24; *see also Duncan v. Louisiana,* 391 U.S. 145, 154, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). To that end, Rule 4–246 requires the defendant to be examined on the record and that the court find on the record that the waiver is knowing and voluntary:

> (b) **Procedure for acceptance of waiver.** A defendant may waive the right to a trial by jury at any time before the commencement of trial. The court may not accept the waiver until, after an examination of the defendant on the record in open court conducted by the court, the State's Attorney, the attorney for the defendant, or any combination thereof, the court determines and announces on the record that the waiver is made knowingly and voluntarily.

Md. Rule 4–246(b).

At the time the parties filed their briefs in this case, the governing cases directed us to look to the totality of the circumstances to determine whether a waiver was valid, *Boulden v. State,* 414 Md. 284, 296, 995 A.2d 268 (2010), and specifically to whether the "record demonstrate[d] an intentional relinquishment of a known right," *id.* at 295, 995 A.2d 268. In *Valonis,* however, the Court of Appeals held that trial courts must comply strictly with Rule 4–246, and that "the circuit court judge ... make an *express determination on the record* that the defendant acted knowingly and voluntarily." 431 Md. at 563, 66 A.3d 661 (emphasis added). Unlike before, appellate courts are not free to infer or interpolate a finding by the trial court that the waiver was knowing and voluntary:

> [T]he judge is required to announce his or her finding as to the knowing and voluntary waiver on the record. Because the waiver of a jury trial is personal, the requirement of an on-the-record determination by the trial judge provides further safeguards to ensure that the decision is in actuality

the defendant's own knowing, voluntary, and personal choice.

*Id.* Indeed, the Rule is a "precise rubric," *id.* at 566, 66 A.3d 661 and a "trial judge's failure to announce its determination on the record is not a mere technicality and is not subject to harmless error analysis," *id.* at 569, 66 A.3d 661.

*Valonis* leaves us no alternative but to reverse Mr. Butler's convictions and remand for further proceedings. The circuit court did not make any findings about Mr. Butler's waiver, and in fact the colloquy during the February 7 Hearing tracked closely the colloquy that the Court of Appeals found in *Valonis* not to comply with Rule 4–246. Mr. Valonis was questioned by his counsel, who advised him of the consequences of the waiver, that he would have a trial in front of the judge instead of a jury, that the jury would have consisted of twelve jurors who would have had to agree on the verdict, and that they would have had to find him guilty beyond a reasonable doubt. Counsel then asked, "It is my understanding you are waiving your right to a jury trial and have His Honor hear the case today?" Mr. Valonis replied, "Yes." *Id.* at 554, 66 A.3d 661. Here, the trial court asked the questions rather than counsel, but the dialogue was almost identical, and in any event similarly "fail[ed] to comply with the determine and announce requirement of Rule 4–246(b) and thereby failed to demonstrate a valid waiver of [Mr. Butler's] right to a trial by jury." *Id.* at 570, 66 A.3d 661. We recognize that *Valonis* had not been decided at the time of the February 7 Hearing, but it nevertheless ends the inquiry here, and we need not address the trial court's later denial of Mr. Butler's motion to withdraw the waiver.

**B. The Trial Court Properly Denied The Motion To Suppress.**

■ Because Mr. Butler could be re-tried on remand, we will address the other errors he contends the circuit court committed, beginning with its decision to deny Mr. Butler's motion to suppress the evidence Detective Sergent found in

his car after the Detective pulled him over.[4] We limit our review of a motion to suppress to the evidence contained in the record of that hearing, *McFarlin v. State,* 409 Md. 391, 403, 975 A.2d 862 (2009), and apply a clearly erroneous standard of review:

> The factual findings of the suppression court and its conclusions regarding the credibility of testimony are accepted unless clearly erroneous. We review the evidence and the inferences that may be reasonably drawn in the light most favorable to the prevailing party.

*Rush v. State,* 403 Md. 68, 83, 939 A.2d 689 (2008) (citations omitted). We owe no deference, however, to the circuit court's evaluation of whether Detective Sergent's suspicions were reasonable—that is a question of law we review *de novo. Holt v. State,* 435 Md. 443, 457–59, 78 A.3d 415, 2013 WL 5779644 (2013).

■ Mr. Butler contends that Detective Sergent was not justified in stopping him because the Detective's observations did not beget reasonable suspicion that Mr. Butler was engaging in criminal conduct, and that his "ambiguous" conduct didn't give the Detective a reasonable basis to think a drug deal was taking place. According to Mr. Butler, Detective Sergent only saw a plastic bag being examined and put in the center console and a passenger leaving the truck, which supports no more than an "inchoate and unparticularized suspicion or 'hunch'" under *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), that a drug deal was under way. He disputes (and disputed at the hearing) Detective Sergent's ability to determine the contents of the plastic bag and argues that because the trial court made no finding of fact as to whether Detective Sergent could determine at the time of the stop that there were pills in the bag, "whether [he] could see what was in the baggie can play no role in this Court's review." He challenges only Detective Sergent's deci-

---

4. At the time of the hearing, only the charges in the 2008 case indictment were pending but the ruling was applied with equal force at trial on all of the charges, including those in the 2010 case indictment.

sion to stop him; he offers no separate challenge to the searches that followed.

The State counters that, viewing the totality of the circumstances, the trial court properly concluded that Detective Sergent had reasonable suspicion to believe that criminal activity was taking place, and thus was justified in stopping Mr. Butler. The State also claims that to the extent there was a conflict about what Detective Sergent could see at the time, this Court must fill in the gaps in the trial court's factual findings and accept Detective Sergent's later testimony that "while he was watching the monitor in 'real time,' he could see that the plastic baggie held pills." The circuit court agreed with the State, finding that the footage Detective Sergent saw from the security monitor, viewed through the lens of his law enforcement experience, gave rise to reasonable suspicion:

> The real problem here is when I look at the video, I say to myself: I'm witnessing a drug transaction. Now, I understand that it's a public parking lot, anybody can park and carry things in plastic bags, but when you have the scenario of a vehicle that comes in and parks, is there briefly, there is a handing back and forth of a plastic baggie that's tied off, and the vehicle then moves, the passenger gets out and gets into the pickup truck and they go their separate ways, that is not, all taken together, an ordinary circumstance, and I don't think there's any question that if I had observed something on my own, and I have observed what I was sure was drug transactions on parking lots, so the circumstances and the observations that the police officer made of a tied-off plastic baggie being examined by both, handed back and forth, to me constitutes reasonable suspicion that a drug transaction was taking place, so I find reasonable suspicion to make the stop, and I will deny the motion to suppress.

 A police officer may not stop people for no reason, but may stop someone briefly and investigate when he has reasonable suspicion that the subject is committing a crime. *Terry*, 392 U.S. at 27, 88 S.Ct. 1868. The officer's actions are "predicated upon the on-the-spot observations of the officer on

the beat," *id.* at 20, 88 S.Ct. 1868 and can be based upon "the specific reasonable inferences which he is entitled to draw from the facts in light of his experience," *id.* at 27, 88 S.Ct. 1868; *see also Holt*, 435 Md. at 461, 78 A.3d at 425 ("We therefore assess the evidence through the prism of an experienced law enforcement officer, and 'give due deference to the training and experience of the ... officer who engaged the stop at issue.' " (quoting *Crosby v. State*, 408 Md. 490, 508, 970 A.2d 894 (2009))). "Reasonable suspicion" is not just an abstract principle; it is a " 'common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act.' " *Crosby*, 408 Md. at 507, 970 A.2d 894 (quoting *Bost v. State*, 406 Md. 341, 356, 958 A.2d 356 (2008)). And reasonable suspicion requires "more than a mere hunch but is 'a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.' " *Nathan v. State*, 370 Md. 648, 663, 805 A.2d 1086 (2002) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)).

When reviewing whether reasonable suspicion supported a particular stop, courts must permit the officer to assess the overall situation at the time:

> [Courts] must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person." Although an officer's reliance on a mere "hunch" is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.

*Nathan v. State*, 370 Md. at 663–64, 805 A.2d 1086 (quoting *United States v. Arvizu*, 534 U.S. 266, 273–74, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (internal quotations and citations

omitted)). The Court of Appeals refined this standard somewhat in *Crosby,* explaining that a detaining officer may not just claim that "innocent conduct was suspicious to him or her." 408 Md. at 508, 970 A.2d 894 (quoting *Bost,* 406 Md. at 356, 958 A.2d 356). But both our cases and the Supreme Court's allow an officer to assess and act on the overall circumstances so long as he can articulate a reasonable basis for stopping a particular person.

A *Terry* stop can, of course, be justified by reasonable suspicion that a defendant possesses controlled dangerous substances. Indeed, in *Williams v. State,* 188 Md.App. 78, 981 A.2d 46 (2009), we held that a stop similar to this one provided not only reasonable suspicion, but met the higher standard of probable cause. As here, an officer observed the defendant through a closed-circuit mounted camera and saw him exchange a small package for cash in an area described as an "open-air" market for drug trafficking activity and other crimes. *Id.* at 83–84, 981 A.2d 46. The officer testified that the men took care to conceal the package and engaged in furtive behavior. After the officer notified an arrest team, they stopped the defendant, removed his jacket, and recovered numerous baggies of crack cocaine from his jacket sleeve. *Id.* at 85, 981 A.2d 46. We held that the officers acted legally in conducting a warrantless search because the officer who saw the defendant had probable cause to believe that a felony was in progress based on the parties' previous transaction, hand grips used, and the special care they took to conceal the suspected CDS. *Id.* at 95–96, 981 A.2d 46; *see also id.* at 94–95, 981 A.2d 46 (citing, among others, *People v. Rodriguez,* 36 A.D.3d 567, 828 N.Y.S.2d 62, 63 (2007) (noting defendant's "brief conversation" with other person in "drug prone location," the exchange of money, and the passing of an unidentified object that fit in defendant's hand, and stating that "any person ... using good common sense" would have known defendant was selling drugs (citations omitted))). Although there may have been plausible, innocent explanations for the men's behavior, we held that the officer need not rule out all

other explanations before concluding that a drug deal may have taken place. *Id.* at 96–97, 981 A.2d 46.

This case presents substantially the same facts as *Williams*, except that we are only looking at whether Detective Sergent met the *less* rigorous "reasonable suspicion" standard, and we find that he did. Detective Sergent had completed professional training relating to drug transactions and had applied that training throughout his eight or so years as a police officer:

A: I had 40 hours of initial training through the Harford County Sheriff's Office Academy, the training academy, and that was in 2001. Since that time I've attended numerous drug interdiction classes and drug identification classes throughout my career as an officer.

Q: And what, if any, practical experience have you had making drug arrests prior to October 21st of 2008?

A: Up until February of this year I was a patrol deputy and worked midnight shift for the majority of those years, at which time I made a substantial amount of drug-related arrests and seizures through traffic stops and foot patrol and things of that nature, where I observed transactions several time, numerous times, and—

Q: And what, if anything, did you learn, either through your formal training or your practical on-the-job experience, about the illegal drug trafficking of pills?

A: Specifically pills, the transactions were similar to many other drug transactions, kept in baggies and things of that nature, similar trade as far as whether it be hand-to-hand buys within vehicles, out on the street—

Q: What is a hand-to-hand buy within a vehicle?

A: Where let's say the person who has the pills, or the dealer as it's referred to, would have a quantity of a particular illegal item, whether it's pills or other drugs, have that quantity and would have a subject, who is known as the buyer commonly referred to, in the

vehicle with him, and usually an exchange of money is given for a quantity of the drug that he is looking for.

\* \* \*

Q: What, if anything, have you learned about drug sellers and drug buyers passing the goods back and forth in your formal training or in your practical experience as a police officer?

A: For a buyer to have inspection of the product prior to making a purchase.

Against the backdrop of his training and experience, the events of October 21, 2008 reasonably supported the Detective's conclusion that the transaction he observed likely was a drug transaction, and therefore supported the stop. He testified to specific elements of the transaction, including "[t]he packaging in the clear bag, the items inside, and the tie-off [that] is very common in drug transactions," and he watched it all happen in a remote part of the parking lot. *See Holt*, 435 Md. at 462–68, 78 A.3d at 426–29; *Williams*, 188 Md.App. at 96, 981 A.2d 46. As the trial court explained, common sense alone would have led anyone to believe something unusual was afoot, and the detective's training and experience added to his ability to conclude reasonably that this transaction involved drugs.

Mr. Butler contends that Detective Sergent lacked reasonable suspicion because he did not specifically see money change hands and could not specifically identify the substance at the bottom of the bag. But neither *Terry* nor our cases require an officer to confirm his observations at that level of granularity before stopping someone to investigate. Requiring Detective Sergent to know that the baggie contained pills would be like requiring the officer in *Terry* to suspect that the defendant was carrying a .38 caliber revolver, not just a gun, before stopping him, a standard that would not just be impracticable, but impossible. And while we agree that Detective Sergent needed more than a "hunch" to stop Mr. Butler, the circumstances surrounding this transaction provided considerably more than that. We find that the circuit court did not err in concluding that Detective Sergent had reasonable suspi-

cion to stop Mr. Butler based on what he saw take place between the two men, and thus that the court properly denied Mr. Butler's motion to suppress.

### C. Mr. Butler Was Not Denied A Speedy Trial.

Mr. Butler also contends that he was denied a speedy trial with regard to the charges contained in the November 12, 2008 indictment, which were not set for trial until February 7, 2011—a delay of two years and three months. The trial court heard argument on the motion during the February 7 Hearing and recognized that a delay of that length was "presumptively prejudicial," but denied the Motion after finding that Mr. Butler had not been prejudiced and that good cause supported the postponements. Mr. Butler argues here that the factors we consider in analyzing the reasonableness of the delay weigh in his favor and mandate reversal. The State, for its part, concedes that the delay was presumptively prejudicial, but maintains that there was good cause for the delays and that Mr. Butler suffered no prejudice in any event. We agree with the State and the circuit court.

A criminal defendant is guaranteed the right to a speedy trial under the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights. *Divver v. State*, 356 Md. 379, 387–88, 739 A.2d 71 (1999). We review a motion to dismiss based on the purported lack of a speedy trial by making "our own independent constitutional analysis." *Glover v. State*, 368 Md. 211, 220, 792 A.2d 1160 (2002). "We perform a *de novo* constitutional appraisal in light of the particular facts of the case at hand; in so doing, we accept a lower court's findings of fact unless clearly erroneous." *Id.* at 221, 792 A.2d 1160 (citations omitted). And as we explained in *Brown v. State*, 153 Md.App. 544, 837 A.2d 956 (2003), "the review of a speedy trial motion should be 'practical, not illusionary, realistic, not theoretical, and tightly prescribed, not reaching beyond the peculiar facts of the particular case.'" *Id.* at 556, 837 A.2d 956 (citation omitted).

The Supreme Court established the standard for speedy trial issues in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The Court rejected the notion that a speedy trial can be measured against a rigid or mechanical deadline, holding instead that courts should apply "a balancing test, in which the conduct of both the prosecution and the defendant are weighed." *Id.* at 530, 92 S.Ct. 2182; *State v. Kanneh,* 403 Md. 678, 687–88, 944 A.2d 516 (2008). The Court identified four factors for us to balance: the " 'length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.' " *Kanneh,* 403 Md. at 688, 944 A.2d 516 (quoting *Barker,* 407 U.S. at 530, 92 S.Ct. 2182). We assess each one in turn and conclude that on balance, and in light of Mr. Butler's testimony before the trial judge, Mr. Butler was not deprived of a speedy trial.

We begin with the chronology of the case up until Mr. Butler filed his motion to dismiss, and we list the time that elapsed between each postponement and the reason for the postponement:

**November 12, 2008:** Indictment filed.

**1. April 22, 2009** (five months later): Trial postponed due to unavailability of the prosecutor, who was in another trial, and lack of a trial judge. The court at the time found "the reason to constitute good cause, and the postponement shall be deemed to be an administrative postponement, charge-able to neither side."

**2. August 25, 2009** (four months later): Trial postponed due to unavailability of a jury. The court again deemed the postponement "administrative, chargeable to neither side."

**3. January 20, 2010** (five months later): Trial postponed due to unavailability of defense witness Mr. Thompson. The court granted this postponement "at the request of [Mr. Butler], charged to [Mr. Butler]."

**4. May 19, 2010** (four months later): Trial postponed due to lack of a judge and deemed "administrative, chargeable to neither side."

5. **October 19, 2010** (four months later): Trial postponed due to unavailability of State's witness (chemist) and deemed "to constitute good cause. It's a postponement requested by the State and is charged to the State."

**February 7, 2011** (three and a half months later): Trial scheduled, but converted into a hearing that addressed jury waiver and speedy trial issues.

Of the five postponements, three were "administrative"— *i.e.*, caused by the lack of a judge or jury—and each party was responsible for one postponement due to a witness's unavailability.

### 1. Length of the delay

■ The State concedes that the total delay of twenty-seven months between the indictment and the denial of the Motion for Speedy Trial is presumptively prejudicial, and therefore requires us to review the *Barker* factors. By itself, though, the length of delay does not merit any particular weight:

> As one of the four factors on the ultimate merits, it is heavily influenced by the other three factors, particularly that of "reasons for the delay." It may gain weight or it may lose weight because of circumstances that have nothing to do with the mere ticking of the clock.

*Ratchford v. State*, 141 Md.App. 354, 359, 785 A.2d 826 (2001). In *Ratchford*, we held that an eighteen–month delay, while "more than enough to spark further analysis, is not on the ultimate merits particularly remarkable," and was "not a weighty factor, one way or the other." *Id.* at 360, 785 A.2d 826.

We find the same to be the case here. Although the delay here was longer than in *Ratchford*, it fell far short of the five-year delay that the Supreme Court still found did not constitute a speedy trial violation in *Barker*, 407 U.S. at 533–36, 92 S.Ct. 2182, and falls into the same range as delays we have found in other cases not to violate the defendant's speedy trial rights. *See, e.g., Wheeler v. State*, 88 Md.App. 512, 517–26,

*596* A.2d 78 (1991) (twenty-three month delay not a violation); *Marks v. State,* 84 Md.App. 269, 281–86, 578 A.2d 828 (1990) (twenty-two month delay not a violation).

We disagree with Mr. Butler that this case was so mundane that, as an administrative matter, it would have proceeded more quickly to trial but for inappropriate delay. He cites *Divver,* 356 Md. at 390–91, 739 A.2d 71, in which the Court of Appeals reversed a conviction based on the defendant's arrest for driving under the influence or driving while intoxicated when the time between his arrest and trial exceeded one year. The *district court* (not circuit court) in *Divver* never assigned a trial date at the outset and did so only nine months after his arrest, for a date yet another four months out. The Court of Appeals held that the delay appeared unjustified in part due to the nature of defendant's case:

> Here, the delay is of uniquely inordinate length for a relatively run-of-the-mill District Court case. Trial of the case to verdict on guilt or innocence presented little, if any, complexity. There was one witness for the State, a police officer whose appearance was subject to the control of the State, and the only witness for the defense was the accused himself. Given these circumstances, the length of the delay in the instant matter operates more heavily in Divver's favor *than would usually be the case in many circuit court prosecutions.*

*Id.* (emphasis added). Applying the *Divver* analysis to this appeal yields the opposite conclusion: this case involved a *circuit court* prosecution that was *not* a run-of-the-mill case to begin with. Mr. Butler's trial included two consolidated cases that were scheduled as a jury trial (at least at the time of the postponements at issue here, and the hearing on the speedy trial motion, which took place the same day as Mr. Butler's jury trial waiver hearing). The State's case included testimony from two detectives and two forensic chemists, and the defense had sought, at least to that point, to offer testimony from Mr. Thompson, who had proven difficult to find. The process of scheduling a trial date that accommodated Mr. Butler's initial jury demand and allowed time for witnesses to

be subpoenaed in advance was, therefore, more complicated than a district court prosecution involving one witness. So although we recognize that the preponderance of delays were attributable to the unavailability of a judge or jury, and thus that this factor weighs against the State, it does not weigh heavily.

### 2. Reasons for the delay

Although all of the delays were of the same magnitude—four to five months—they were caused by different circumstances, which gives them less significance for speedy trial purposes than a longer single delay. *Jones v. State*, 279 Md. 1, 7, 367 A.2d 1 (1976) (explaining that "delays must be examined in the context in which they arise and therefore a lengthy uninterrupted period chargeable to one side will generally be of greater consequence than an identical number of days accumulating in a piecemeal fashion over a long span of time").

Mr. Butler agrees that the initial delay between the indictment and the first trial date is "accorded neutral status," as being "necessary for the orderly administration of justice." *Howell v. State*, 87 Md.App. 57, 82, 589 A.2d 90 (1991). Although he concedes that most of the remaining delay on the State's part does not factor as heavily as a purposeful delay, he argues that the eighteen-month delay caused by over-booked courts and unavailable State witnesses are nonetheless "chargeable to the State." Obviously, Mr. Butler's view differs from that of the trial judges on several occasions below, when they concluded that administrative delays were *not* chargeable to the State. But even if we were to charge the delays to the State in the sense that the court system occasioned the delay rather than Mr. Butler, these generalized administrative delays carry less weight than delays relating to this case in particular. Differently put, a delay because the court system is bogged down does not cause the concern that a prosecutor's tactical or negligent delays would:

Unintentional delays caused by overcrowded court dockets or understaffed prosecutors are among the factors to be

weighed less heavily than intentional delay, calculated to hamper the defense, in determining whether the Sixth Amendment has been violated but ... they must "nevertheless ... be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant."

*Strunk v. United States*, 412 U.S. 434, 436, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973) (quoting *Barker*, 407 U.S. at 531, 92 S.Ct. 2182). Negligent delay by the State relating to the defendant's particular case would weigh heavily in the final analysis and differs markedly from the delays here, *see Brady v. State*, 291 Md. 261, 264–65, 434 A.2d 574 (1981) (reversing conviction where fourteen-month delay was caused by prosecutorial neglect first in dismissing charges and then indicting defendant again on the same charges, second in making no attempt to find him within the prison system, and third in asking for a postponement when the case did finally come to trial), and along the spectrum any intentional or negligent delays by the State are weighed heavily against it. *See, e.g., Davidson v. State*, 87 Md.App. 105, 111, 112, 589 A.2d 114 (1991) (five-year delay demonstrated that the case "fell through the cracks" and would be given substantial weight against the State, as "[t]he degree of weight to be attributed to a delay resulting from negligence increases in direct proportion to the length of the delay"); *compare Divver*, 356 Md. at 391–92, 739 A.2d 71 (although delay was attributable to the State where largely due to district court's lacking a full complement of judges, it was weighted "not as heavily as it would were this a case in which the delay was purposeful, in order to hamper the defense"). At the opposite end of the spectrum are delays occasioned by a defendant, which cannot form the basis for a claim of deprivation. *Ratchford*, 141 Md.App. at 362–63, 785 A.2d 826 (where defendant seeks postponement based on delays due to his changes in counsel, he can't claim speedy trial violation).

In this case, the five postponements travel the spectrum, but none demonstrates any negligence or gamesmanship on the part of the State. The only logistical delay based on the

specifics of the case was the four-month postponement on October 19, 2010, caused by a witness's unavailability, which the circuit court charged to the State but found was supported by good cause. Three of the delays were administrative and at best weigh only slightly against the State. The last delay, on January 20, 2010, was attributable to Mr. Butler. This factor, then, moves the needle only slightly in Mr. Butler's favor.

### 3. Assertion of the right

 A defendant has a responsibility to assert his right to a speedy trial, and whether he does so, and *how* he does so, factors into our analysis: "It would . . . allow a court to weigh the frequency and force of the objections as opposed to attaching significant weight to a purely *pro forma* objection." *Barker,* 407 U.S. at 529, 92 S.Ct. 2182. Put another way, "[t]he more serious the deprivation, the more likely a defendant is to complain." *Id.* at 531, 92 S.Ct. 2182.

There is no dispute that Mr. Butler preserved the right to a speedy trial, but mechanically so. *First,* a speedy trial objection was included among the seven laundry list motions Mr. Butler's first attorney filed on December 16, 2008, when he entered his appearance shortly after Mr. Butler was charged. *Second,* when his next attorney entered his appearance on February 19, 2010, he filed a three-page omnibus motion asserting as well, among another kitchen-sink list of claims, that Mr. Butler's right to a speedy trial had been violated. These motions undeniably asserted Mr. Butler's right to a speedy trial, but only as part of a catch-all preservation strategy and without articulating any case-specific arguments or prejudice. Mr. Butler has satisfied this factor, but more as a matter of form than substance. *See State v. Ruben,* 127 Md.App. 430, 443, 732 A.2d 1004 (1999) (while written demand for speedy trial in omnibus pretrial motion preserved the right, such "formal assertions" of the right "were not calculated to forcefully bring the harsh consequences of the deprivation of a constitutional right to the attention of the circuit

court," and were neutral, neither supporting nor refuting the defendant's argument).

### 4. Prejudice to the defendant

When asked at the February 7 Hearing to articulate the prejudice he had suffered from the delays to that point, Mr. Butler offered an inconclusive answer: he claimed only that the delays in the trial had caused Mr. Thompson to become unavailable as a witness. According to Mr. Butler, Mr. Thompson would have testified that Mr. Butler obtained the oxycodone from him in an attempt to support his own habit, rather than to sell it. As the trial court noted, however, this testimony would have been of dubious value to Mr. Butler:

> We also have to ask ourselves how would Mr. Thompson have been of any assistance to him. It seems to me he would have been of zero assistance to him.... There is a sort of a concession ... that Mr. Thompson would not have helped him on the possession charge [and] would not have helped him on the charge with regard to the scale. The argument is Mr. Thompson would have testified Mr. Butler had a bad drug habit. Mr. Butler on that witness stand though testified as to how much he was using. That issue, how much he was using, would have been something that the [trier] of fact would have had to return, possession of a sufficient quantity indicating an intent to distribute. I don't see that the testimony of Mr. Thompson even to the effect that Mr. Butler had a bad habit would have been of much assistance to him in this case.

We rejected a similarly vague theory of prejudice in *Ruben*, 127 Md.App. at 444, 732 A.2d 1004, where the defendant claimed prejudice from the fact that shotgun shells recovered at the scene of a shooting and available at the time of the original trial date were lost by the time of trial. In that case, we explained that the loss of the evidence did not disadvantage the defendant:

> In the case at bar ... it is uncertain whether the lost shells would have been "witnesses" for the defense or "witnesses" for the prosecution. To the extent that the shells would

have been useful in rebutting the State's physical evidence at trial, the effect of their loss can be ameliorated by an appropriate evidentiary ruling, or by a jury instruction on spoliation. In short, appellee can not establish particularized prejudice to his case as a result of the destroyed evidence. We shall therefore consider the potential for prejudice that arises from the lost shells indeterminate....

*Id.; see also Dalton v. State,* 87 Md.App. 673, 690–91, 591 A.2d 531 (1991) (finding, under *Barker* analysis, no prejudice caused by victim's not having testified, where he ostensibly would have testified favorably for the defendant, but efforts to subpoena him had been sporadic, victim's credibility was subject to attack, and defendant could not show his testimony would have been critical). In *Epps v. State,* 276 Md. 96, 345 A.2d 62 (1975), the Court of Appeals found actual prejudice where an alibi witness had been prepared to testify at the time of the first trial, but was inducted into the armed forces and was not in the country at the time of trial. In that instance, any possible defense available to the defendant "was obliterated when by reason of the postponement ... he was denied the opportunity of presenting the testimony of his alibi witness." *Id.* at 120, 345 A.2d 62. But the unavailable testimony must actually *help* the defendant, as it would have in *Epps. See Barnett v. State,* 8 Md.App. 35, 41, 257 A.2d 466 (1969) ("Certainly, if a witness *who could substantiate a valid defense,* and who would have been available but for the delay, became unavailable as the result of the delay, such unavailability would be a most compelling showing of prejudice." (emphasis added)).

We agree with the trial court's finding that Mr. Butler was not prejudiced here. *First,* we don't see how Mr. Thompson would have been of much help to Mr. Butler. At best, and taking Mr. Butler's proffer at face value, Mr. Thompson would have testified that Mr. Butler had an addiction to oxycodone that he tried to hide, a fact that Mr. Butler admitted in his own testimony and that was never disputed. More to the point, Mr. Butler never proffered that Mr. Thompson would testify that he sold Mr. Butler a large quantity of CDS for personal use or otherwise refute the State's theory that Mr.

Butler sold oxycodone to support his habit. Indeed, any helpful testimony would have exposed Mr. Thompson to serious charges, and any detailed testimony Mr. Thompson might have offered about the transaction at issue would undercut Mr. Butler's defenses to the possession charge. *Second,* Mr. Butler never did explain how Mr. Thompson being incarcerated prevented him from locating Mr. Thompson, whether by using other resources, his counsel or on his own, by the time the last two trial dates came around. And as the trial court pointed out, Mr. Butler did not even subpoena Mr. Thompson for the last two trial dates, which suggests that he was not an important witness after all.

### 5. Balancing the *Barker* factors

After weighing all of the *Barker* factors, we conclude that Mr. Butler has failed to prove a violation of his right to a speedy trial. Although his trial was delayed long enough to warrant review, the delays were neither unreasonable nor tactical, and he has not demonstrated any prejudice. Most of the reasons for the delay were administrative, which might tip the balance *if* Mr. Butler could establish that the other factors weighed heavily in his favor. But again, the third and fourth factors don't. He asserted his speedy trial rights only as a formality, occasioned only by changes in counsel. Courts "have stressed the importance of the prejudice prong," *Fields v. State,* 172 Md.App. 496, 545, 916 A.2d 357 (2007), and by his own reckoning, Mr. Butler suffered only the inability to call a witness whose testimony would not have helped him. We find, then, that Mr. Butler has fallen short of establishing a speedy trial violation, and thus that the circuit court did not err in denying his motion to dismiss.[5]

### D. The Scale Qualified As A Device Adapted To Produce A Controlled Dangerous Substance.

*Finally,* Mr. Butler argues that the court lacked sufficient evidence to convict him of possessing the scale for

---

5. We offer no views on whether delays on remand might (or might not) support a speedy trial motion.

the purpose of "manufacturing" a CDS. We review a challenge to the sufficiency of the evidence (whether following a jury trial or a bench trial) to determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Titus v. State*, 423 Md. 548, 557, 32 A.3d 44 (2011) (emphasis added) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); *Moore v. State*, 189 Md.App. 90, 97–98, 983 A.2d 583 (2009) (citing *Robinson v. State*, 209 Md.App. 174, 196, 58 A.3d 514 (2012)), *aff'd*, 424 Md. 118, 34 A.3d 513 (2011). It is up to the fact-finder to believe, disbelieve, or discount witness testimony, *Moody v. State*, 209 Md.App. 366, 387, 59 A.3d 1047 (2013), and we defer to all reasonable inferences the fact-finder might have drawn, even if we might have reached a different result, *Cox v. State*, 421 Md. 630, 657, 28 A.3d 687 (2011) (citing *Bible v. State*, 411 Md. 138, 156, 982 A.2d 348 (2009)).

That said, Mr. Butler's argument doesn't really turn on the sufficiency of the evidence—there is, after all, no dispute (beyond his effort to suppress it) that he possessed a digital scale that had cocaine residue on it.[6] Instead, he disputes as a matter of law whether a scale can qualify as "a machine, equipment, instrument, implement, [or] device ... adapted to produce a controlled dangerous substance" for purposes of CL § 5–603. He argues from the prior version of that statute (and cases interpreting that version) that the definition of "manufacture" precludes the State from including equipment used to weigh or package a CDS that he did not manufacture directly. And under the old law, he would have been correct. *See Davis v. State*, 319 Md. 56, 570 A.2d 855 (1990). But we review questions of law *de novo*, *Snowden v. State*, 156 Md.App. 139, 143 n. 4, 846 A.2d 36 (2004), *aff'd*, 385 Md. 64, 867 A.2d 314 (2005), and the law has changed: we hold that under the version of the statute *in effect at the time of the*

---

6. Nor is there any dispute that Mr. Butler was convicted of possessing cocaine with intent to distribute, a conviction he has not appealed.

*alleged crime,* a scale used to package cocaine could qualify as a "machine, equipment, instrument, implement, [or] device . . . adapted to produce a controlled dangerous substance."

Mr. Butler was convicted of violating CL § 5–603, which prohibits the possession of items used to "produce" a CDS:

> [A] person may not . . . manufacture, distribute, or *possess* a machine, equipment, instrument, implement, *device,* or a combination of them *that is adapted to produce a controlled dangerous substance* under circumstances that reasonably indicate an intent to use it to produce, sell, or dispense a controlled dangerous substance in violation of this title.

*Id.* (emphasis added).

The term "produce" includes "to *manufacture,* plant, cultivate, grow, and harvest." CL § 5–101(w) (emphasis added). And that brings us to the dispositive question—the meaning (and thus scope) of the word "manufacture" under Title 5:

> *Manufacture.*—(1) "Manufacture," with respect to a controlled dangerous substance, means to produce,[7] prepare, propagate, compound, convert, or process a controlled dangerous substance:
>
> (i) directly or indirectly by extraction from substances of natural origin;
>
> (ii) independently by chemical synthesis; or
>
> (iii) by a combination of extraction and chemical synthesis.
>
> (2) "Manufacture" includes *to package and repackage a controlled dangerous substance* and label and relabel its containers.
>
> (3) "Manufacture" does not include:
>
> (i) to prepare or compound a controlled dangerous substance by an individual for the individual's own use; or

---

7. We couldn't help but notice the circularity of the definitions of "manufacture," which includes "producing," and "produce," which includes "manufacture." Fortunately, this case does not require us to solve that conundrum.

(ii) to prepare, compound, package, or label a controlled dangerous substance [under certain circumstances not relevant here].

CL § 5–101(p) (emphasis added). Again, there is no dispute that Mr. Butler possessed the scale—the question is whether Mr. Butler "packaged or repackaged a CDS" with it.

We conclude that CL § 5–101(p) includes the manufacture (and thus production and thus packaging) of *any* CDS, whether or not Mr. Butler turned raw materials into cocaine himself. Although the definition of "manufacture" in CL § 5–101(p)(1) limits itself to extraction of a CDS from "substances of natural origin" or "independently by chemical synthesis" or the two in combination, CL § 5–101(p)(2) includes—beyond the initial definition—packaging and repackaging "*a* CDS," without limiting the type of CDS to one that the person has extracted or made by chemical synthesis within the meaning of CL § 5–101(p)(1). This language represents a change in the statute that matters: under the old version of the statute, a strategically-placed use of the phrase "*the* CDS" restricted a defendant's liability for possession of packaging equipment to CDSs he had extracted naturally or produced by chemical synthesis. In our view, the General Assembly's decision to broaden the language—it changed "the CDS" to "a CDS"—broadened the reach of CL § 5–101(p) to include equipment used to package CDSs, whether or not the defendant had extracted or produced them.

The old version of the law, § 286(a)(4) of Article 27 to the Maryland Code (1957, 1987 Repl.Vol., 1989 Cum.Supp.), made it a felony to "possess any ... device ... adopted [8] for the production of controlled dangerous substances," much like CL § 5–603 does now. The definition of "production" at that time similarly included the "manufacture" of a dangerous substance. Art. 27, § 277(u). The important difference came in the definition of "manufacture," which was substantially the same but for one article:

---

**8.** This is not a typo—the prior version used the verb "adopted," and the revision changed it (more logically) to "adapted."

"Manufacture" shall mean the production ... of a controlled dangerous substance either directly or indirectly by extraction from substances of natural origin, or independently by means of chemical synthesis or by a combination of extraction and chemical synthesis and includes any packaging or repackaging of *the* substance or labeling or relabeling of its containers....

Art. 27 § 277(p) (emphasis added).

In *Davis*, the Court of Appeals reversed the defendant's conviction under this prior version of the statute for possessing "jars, baggies, canisters, or the like for the packaging or repackaging of PCP for purposes of sale or distribution," reasoning that the use of the word "the" emphasized above meant that packaging or repackaging had to be of a CDS that had been *extracted* or *made by chemical synthesis* by the defendant, as opposed to just being *purchased* and *repackaged* by the defendant. 319 Md. at 60, 570 A.2d 855. In other words, *Davis* required the State to prove that the defendant had actually *produced or extracted* the CDS, and wasn't just obtaining it from another source only to break it down into smaller quantities to resell it. The Court drew this conclusion from the language of the statute itself:

[W]e believe the legislative intent is made manifest by the words of the statute, and particularly the definition of "manufacture" found in § 277(p). This statutory definition does not include the packaging or repackaging of *any* controlled dangerous substance. It includes only packaging or repackaging of controlled dangerous substances that have been manufactured in the manner described by the legislature. The language of § 277(p) concerning "packaging or repackaging of *the* substance or labeling or relabeling of *its* containers" refers back to the controlled dangerous substance that is produced by extraction or by means of chemical synthesis, or by both means.

The obvious legislative intent was to include packaging and labeling within the definition of "manufacture" when that packaging or labeling is in conjunction with a true manufacturing process.

*Id.* at 61–62, 570 A.2d 855 (emphasis in original). And because there was no evidence in *Davis* that the defendant had himself extracted or manufactured PCP, but only was repackaging PCP he had gotten from another source with the intent to distribute it, the Court held the evidence insufficient as a matter of law. *Id.* at 62, 570 A.2d 855; *see also Grant v. State,* 141 Md.App. 517, 537–40, 786 A.2d 34 (2001) (reading the statute consistent with *Davis* ) (superseded by statute on other grounds, CL § 3–203).

In 2002, however, and not long after *Grant,* the General Assembly recodified Title 27 and, importantly, revised the definition of "manufacture." Section 277(p) was recodified as CL § 5–101(*o*) (it was later renumbered as CL § 5–101(p)) and changed one important word: whereas the term "manufacture" previously had included "any packaging or repackaging of *the* substance"—the language that, in *Davis,* limited the universe of substances to those the defendant produced or extracted—that term now included "packag[ing] or repackag[ing of] *a* controlled dangerous substance." CL § 5–101(p)(2) (emphasis added). Put another way, the limiting article on which *Davis* turned was removed and replaced with an indefinite article.

This revision changed the definition of "manufacture." And because *Davis* found the legislative intent regarding the scope of that definition in the statutory language (and indeed in that very article), we must determine whether that change in language reflects a change in legislative intent, keeping in mind that the primary goal of statutory construction is " 'to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision[.]' " *Barbre v. Pope,* 402 Md. 157, 172, 935 A.2d 699 (2007) (quoting *Dep't of Health & Mental Hygiene v. Kelly,* 397 Md. 399, 419–20, 918 A.2d 470 (2007)). The necessary first step is to look to the "normal, plain meaning of the language of the statute," which we read in its entirety to ensure that " 'no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.' " *Doe v. Montgomery Cnty. Bd. of Elections,* 406 Md. 697, 712, 962 A.2d 342 (2008) (quoting *Barbre,*

402 Md. at 172, 935 A.2d 699). If we conclude that the language of a statute is clear and unambiguous, we stop there. *Barbre*, 402 Md. at 173, 935 A.2d 699. But we stay within the bounds of common sense: "If persuasive evidence exists outside the plain text of the statute, we do not turn a blind eye to it.... This enables us to put the statute in controversy in its proper context and thereby avoid unreasonable or illogical results that defy common sense." *Adamson v. Corr. Med. Servs.*, 359 Md. 238, 251–52, 753 A.2d 501 (2000) (citations omitted). If there is ambiguity or the language is susceptible to more than one meaning, then we look further: to "legislative history, case law, purpose, structure, and overarching statutory scheme in aid of searching for the intention of the Legislature." *Whitley v. Md. State Bd. of Elections*, 429 Md. 132, 149 (2012). We don't go out of our way to find ambiguity, and "[i]f a specific term is not defined in the statute, the Court 'will give that term its ordinary and natural meaning and will not resort to subtle or forced interpretations for the purpose of extending or limiting the operation of the statute.' " *F.D.R. Srour P'ship v. Montgomery County*, 179 Md.App. 109, 123, 944 A.2d 1149 (2008) (quoting *Md.–Nat'l Capital Park & Planning Comm'n v. State Dep't of Assessments & Taxation*, 110 Md.App. 677, 689, 678 A.2d 602 (1996), *aff'd*, 348 Md. 2, 702 A.2d 690 (1997)), aff'd, 407 Md. 233, 964 A.2d 650 (2009).

As a matter of language and logic, "a" is broader than "the." One authoritative source defines "a" as meaning "one, some, any," I *The Oxford English Dictionary* 4 (2d ed.1989), and the now-absent definition from *Black's Law Dictionary*[9] defined "[a]" as " 'one' or 'any,' but less emphatically than either." *Black's Law Dictionary* 1 (5th ed.1979); *see also Lincoln W. Partners, L.P. v. Dep't of Hous. Pres. & Dev.*, 179 Misc.2d 271, 684 N.Y.S.2d 744, 749 (N.Y.Sup.Ct.1998) (quoting same and

---

9. Editor Bryan Garner notes in the preface to the ninth edition that Black's has been "almost entirely rewritten" between the sixth and ninth editions, *Black's Law Dictionary* ii (9th ed.2009), and has cut a number of "non-legal" definitions—including, for example, by cutting down the definition of "a" discussed in the text, and by omitting any definition of "the" altogether.

reading "*a* non-conforming use" within the statute in question to be the equivalent of "*any* non-conforming use" (emphasis added)); *Pleasants Invs. Ltd. P'ship v. Dep't of Assessments & Taxation,* 141 Md.App. 481, 493, 786 A.2d 13 (2001) (construing an alternate definition of "a," within the context of a land use statute to require only *one* land use, and not more than one; looking to *Black's Law Dictionary* (6th ed.1990) and quoting the dictionary's assertion that "the meaning depends on context"). So where *Davis* read the definite article to limit the range of CDS the equipment could be used to package, the revised statute brings *any* CDS within its scope. That is, even though CL § 5–101(p)(1) prohibits the manufacture of a CDS by extraction or chemical synthesis (or both), § 5–101(p)(2) prohibits manufacture of *any* CDS by packaging or repackaging.

Mr. Butler argues that the change from "the" to "a" has no effect because the Special Revisor's Note to the 2002 amendments states that the subsection was enacted "without substantive change" from the former subsection. According to Mr. Butler, this note suggests that the General Assembly acquiesced in the holding in *Davis. See Jones v. State,* 362 Md. 331, 337–38, 765 A.2d 127 (2001). Notwithstanding the Revisor's Note, the word central to the holding in *Davis,* "the," is no longer in the statute.[10] And to read the phrase "a CDS" to be as limited as the phrase "the CDS" would substantively re-limit language the General Assembly amended (and broadened), a "forced interpretation" we decline to impose. *See F.D.R. Srour P'ship,* 179 Md.App. at 123, 944 A.2d 1149.

As such, we hold that CL § 5–603 covers the scale Mr. Butler is charged with possessing for the purpose of packag-

---

10. The Revisor's Note constitutes the only legislative history regarding the recodification. And although we recognize that a revisor's note can be helpful in discerning legislative intent, *see Dean v. Pinder,* 312 Md. 154, 163, 538 A.2d 1184 (1988) (heeding the "well-settled practice of this Court to refer to the Revisor's Notes when searching for legislative intent of an enactment"), we find no ambiguity in the present statute that requires us to look beyond its plain meaning. *Barbre,* 402 Md. at 173, 935 A.2d 699.

ing or repackaging the cocaine he was convicted of possessing with intent to distribute. And from there, the evidence readily supports the trial court's finding that the scale was used to "package or repackage" a CDS. Detective Glassman testified that a scale is used by drug dealers "[t]o weigh out proper amounts [of a drug such as cocaine]. A drug dealer doesn't want to give out more than he has to, so he is going to use the scale to properly weigh the product prior to the sale." Ms. Burns testified that the scale tested positive for cocaine residue, and Mr. Butler admitted that the scale was in his car. Viewed as a whole, the trial court had sufficient evidence on which it could base its conclusion that Mr. Butler possessed the cocaine-laced scale for the purpose of "packag[ing] and repackag[ing]" cocaine.

**JUDGMENTS OF THE CIRCUIT COURT FOR HARFORD COUNTY IN SEPTEMBER TERM 2012, CASE NOS. 176 AND 177 REVERSED AND REMANDED FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE SPLIT EQUALLY BETWEEN THE PARTIES.**